**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| SE PROPERTY HOLDINGS, LLC, | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 12-00303-KD-M |
| | ) | |
| SANDY CREEK II, LLC, *et al.*, | ) | |
|      Defendants. | ) | |

**ORDER**

This action is before the Court on the Motions for Summary Judgment and supporting documents filed pursuant to Rule 56 of the Federal Rules of Civil Procedure by Plaintiff/Counterclaim Defendant SE Property Holdings, LLC ("SEPH") (Docs. 63-65), Defendants Lester Boihem ("Boihem") and Carroll Castille ("Castille") (Docs. 86-88), Defendants/Counterclaim Plaintiffs Paul Peed and Raymond Peed (collectively, "the Peeds") (Docs. 90-92), and Defendants Nanni Pidikiti ("Pidikiti") and Coast Investment Properties, LLC ("CIP") (Doc. 93), and the various responses (Docs. 83-85, 89, 103-105), replies (Docs. 98-100, 106-108), and sur-replies (Docs. 111-113) to same.[1]  All of these motions are now ripe for adjudication.  Upon consideration, and for the reasons set forth herein, the Court finds that SEPH's motion for summary judgment is due to be **GRANTED** except as to Pidikiti and CIP, for whom it is due to be **DENIED**, and that the aforementioned Defendants' motions for summary judgment are due to be **DENIED**.

**I.      Procedural History**

On May 3, 2012, SEPH initiated this action by filing a Complaint (Doc. 1) against Defendants Sandy Creek II, LLC ("SC II"), George W. Skipper III, Boihem, Castille, CIP, Pidikiti, the Peeds, and the Rookery, LLC ("the Rookery").  The Complaint alleged breach of

---

[1] The Court does not consider SEPH's Motion for Summary Judgment against Defendant George W. Skipper, III (Docs. 78-80) at this time, as the claims against Skipper in this action have been referred to his bankruptcy proceeding for appropriate disposition (Doc. 71).  No part of this Order shall be interpreted as applying to the claims against Skipper.

promissory notes by SC II (identified as "Borrower" in the Complaint) (Count 1) and breach of guarantee agreements by all other Defendants (identified as "Guarantors" in the Complaint") (Count 2).  SEPH also demanded that the Court order an accounting and inspection of certain financial transactions by the Defendants (Count 3).[2]  The Defendants filed their various Answers (Docs. 31-35, 37-38), with the Peeds also asserting counterclaims against SEPH for declaratory judgment[3] and promissory and equitable estoppel (the estoppel counterclaims were subsequently dismissed (Doc. 53)).

On January 10, 2013, SEPH filed a Motion for Summary Judgment against all Defendants except for George Skipper (Doc. 63), moving for summary judgment in its favor on its breach-of-contract claims against those Defendants.[4]  All of those Defendants except SC II (hereinafter, the "Guarantor Defendants") filed responses in opposition (Docs. 83-85, 89), to which SEPH has replied (Docs. 98-100).  All Guarantor Defendants except the Rookery have also filed their own motions (Docs. 86-88, 90-93) moving for partial summary judgment in their favor on SEPH's claims against them.  SEPH has filed responses in opposition (Docs. 103-105) to each of those motions, the Guarantor Defendant movants have filed replies to those responses (Docs. 106-108), and SEPH has filed sur-replies to those replies (Docs. 111-113).

SEPH requests that the motion for partial summary judgment filed by Pidikiti and CIP

---

[2] After a review of the record, the Court finds, as SEPH alleges (Doc. 1 at 3, ¶ 11), that it has subject matter jurisdiction over this action due to diversity pursuant to 28 U.S.C. § 1332.

[3] The Peeds allege their declaratory judgment counterclaim pursuant to Alabama law (Doc. 34 at 19-21).  In his Report and Recommendation, the Magistrate Judge stated: "The Court notes that the Peeds have attached an Amended Counterclaim (Doc. 45-1) wherein the proper law, the Federal Declaratory Judgment Act, is cited instead of the state act . . . [I]f this Report and Recommendation is adopted, then the Peeds are **ORDERED** to file a Motion for Leave to file the Amended Counterclaim and attach such for consideration at that time."  (Doc. 52 at 3 n.1).  The undersigned has since adopted the Report and Recommendation.  (Doc. 53).  To date, however, the Peeds have not complied with the Magistrate Judge's order.

[4] Technically, SEPH's motion "requests that the Court enter final summary judgment as to []Count One of its Complaint against the Defendants."  (Doc. 63).  Count One asserts a claim only against SC II.  However, SEPH's supporting brief and the various responses to the motion makes it clear that SEPH requests summary judgment on both breach-of-contract counts in the Complaint.

(Doc. 93) be "denied as untimely."  (Doc. 105 at 1 n.1).  As SEPH correctly points out, the Court's Rule 16(b) Scheduling Order states that "[m]otions for summary judgment and any other dispositive motions . . . are to be filed . . . in no event later than **April 19, 2013**." (Doc. 44 at 5, ¶ 11).  The Court never extended this deadline.  Pidikiti and CIP filed their motion on April 22, 2013, without requesting permission to file it out of time or explaining the late filing.  Pidikiti and CIP's reply (Doc. 102) in support of their motion, itself filed a day late and after their motion had been taken under submission, similarly offers no reason for the untimely filing of their motion (nor indeed for that of the reply itself).  Upon consideration, the Court finds that Pidikiti and CIP's motion is due to be **STRICKEN** as untimely filed, except to the extent that arguments timely filed by the other Guarantor Defendants are applicable to Pidikiti and CIP.

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56(c) governs procedures and provides as follows:

> **(1)** ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>     (A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>     (B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2)** ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3)** ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4)** ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

In this action, both Plaintiff SEPH and the Guarantor Defendants (except the Rookery) have moved for summary judgment as to SEPH's claims. " 'Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . Nonetheless, cross-motions may be probative of the non-existence of a factual dispute when . . . they demonstrate a basic agreement concerning what legal theories and material facts are

dispositive.' " United States v. Oakley, 744 F.2d 1553, 1555-56 (11th Cir. 1984) (quoting

Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co., 512 F.2d 1017 (5th Cir. 1975)) (per

curiam) (second ellipsis added).  See also Wermager v. Cormorant Twp. Bd., 716 F.2d 1211,

1214 (8th Cir. 1983) ("[T]he filing of cross motions for summary judgment does not necessarily

indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to

a plenary determination on the merits.").

Defendant SC II failed to file any opposition to SEPH's motion for summary judgment.

As such, the Court construes the motion as unopposed with respect to SC II.  Specifically, Local

Rule 7.2(b) for the Southern District of Alabama requires a party responding to a Rule 56 motion

to specify the disputed facts, if any, and that failure to do so will be interpreted as an admission

that there is no material factual dispute:

> Within thirty (30) days…[of the filing of a motion for summary judgment] or as
> may be otherwise ordered, the party or parties in opposition shall file a brief in
> opposition thereto, and, if it is contended that there are material factual disputes,
> shall point out the disputed facts appropriately referenced to the supporting
> document or documents filed in the action.  Failure to do so will be considered an
> admission that no material factual dispute exists; provided, that nothing in this
> rule shall be construed to require the non-movant to respond in actions where the
> movant has not borne its burden of establishing that there is no dispute as to any
> material fact.

S.D. ALA. L.R. 7.2(b).  Because SC II has failed to point out any disputed facts due to a lack of

response to the pending motion, its "[f]ailure to do so will be considered an admission that no

material factual dispute exists." L.R. 7.2(b).  See, e.g., Patton v. City of Hapeville, Ga., 162 F.

App'x 895, 896 (11th Cir. 2006)[5] (providing that "the district court properly held that the

defendants' statement of undisputed facts filed with their motion for summary judgment were

admitted when Patton failed to respond to the statement of facts in accordance with the Federal

---

[5] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Aug. 1, 2012).

Rules of Civil Procedure and the Local Rules[]").

Nevertheless, the Court notes that the "mere failure of the non-moving party to create a factual dispute does not automatically authorize the entry of summary judgment for the moving party." Dixie Stevedores, Inc. v Marinic Maritime, Ltd., 778 F.2d 670, 673 (11th Cir. 1985). Instead, "Rule 56 requires the moving party to demonstrate the absence of a genuine issue of fact." Id. In United States v. One Piece of Property, 5800 S.W. 4th Ave., Miami, Florida, 363 F.3d 1099 (11th Cir. 2004), the Eleventh Circuit held that "[t]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion," Id. at 1101, and noted the provision in Fed. R. Civ. P. 56(e) that when "'the adverse party does not respond, summary judgment, if appropriate, shall be entered against the adverse party.'" Id. at 1101 (emphasis in original); see also Trustees of the Central Pension Fund of the Int'l Union of Operating Engineers and Participating Employers v. Wolf Crane Service, Inc., 374 F.3d 1035, 1040 (11th Cir. 2004) (vacating and remanding the district court's grant of summary judgment, in part, "[b]ecause summary judgment cannot be granted as a sanction for merely failing to file a response to a motion for summary judgment").

## III.    Facts

SEPH is the successor in merger for Vision Bank.  (Doc. 64-1 at 1, ¶ 1 – Harmon Aff.; Doc. 98-1, Certificate of Merger & Transfer).  Vision Bank made two loans to SC II: 1) a $5 million loan to purchase real property ("property loan") (Doc. 83-35 - Defs.' Ex. 33), which was executed on September 30, 2005, and matured on April 1, 2006, and 2) a $2 million loan to begin developing the property ("construction loan"), which was executed on October 13, 2006, and matured on April 1, 2007 (Docs. 83-13 & -14 – Defs.' Exs. 10-11).  (See also Doc. 83-3 at 5, 31-33, 58-59 – Braswell Depo.).  In 2008, Vision Bank sold $4.5 million of the $5 million property loan to other banks pursuant to participation agreements.  (Docs. 83-36 – 83-40; 85-1 at 13, 45,

58-59).  Both loans were secured by mortgages on the real property (Doc. 83-3 at 34-35) and were executed with SC II as the borrower.  (Docs. 83-13 & -35).  The property loan named all other Defendants in this action, along with other non-parties, as guarantors (Doc. 83-35 at 1-2, ¶ 3), with each of these guarantors executing Continuing Guaranties in September 2005 (hereinafter, the "2005 Unlimited Guaranties") (Doc. 64-1 at 17-51).  The construction loan named as guarantors the Peeds, Boihem, Castille, and Pidikiti (hereinafter, sometimes collectively referred to as the "Construction Loan Guarantors"), along with other non-parties (Doc. 83-13 at 1-2, ¶ 3), with each of these guarantors executing Limited Continuing Guaranties in October 2006 (hereinafter, the "2006 Limited Guaranties").  (Doc. 64-1 at 57-87).

Each of the 2005 Unlimited Guaranties provides, in relevant part, as follows:

1. **Guaranty.** For valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the undersigned, [Name of Guarantor] (hereinafter called "Guarantor"), unconditionally guarantees and promises to pay to **VISION BANK**, a corporation (hereinafter called "Bank"), or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC**, an Alabama limited liability company (hereinafter called "Borrower"), to Bank.  The word "Indebtedness" is used herein in its most comprehensive sense and pertains to a loan in the principal amount of Five Million Dollars ($5,000,000.00) being made by Bank to Borrower on or about the date hereof (the "Loan").  "Indebtedness" includes any and all advances, debts, obligations and liabilities of Borrower to Bank heretofore, now, or hereafter existing, made, incurred, or created, whether voluntary or involuntary, arising under, pursuant to or in connection with the Note (as hereinafter defined) and/or any and all other Loan Documents (as hereinafter defined), whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, not limited to but including principal, interest, costs of collection, attorney's fees and all other lawful charges . . . "Note" refers to the $5,000,000.00 principal amount Promissory Note dated on or about September 30, 2005, from Borrower to the Bank, as the same may from time to time be amended, restated, extended, consolidated, replaced and/or renewed, together with all such amendments, restatements, extensions, consolidations, replacements and/or renewals.  "Loan Documents" (or singularly a "Loan Document") refers to the Note, the Mortgage and Security Agreement ("Mortgage") dated on or about the date hereof between Borrower and Bank and relating to the Loan, and all other documents and instruments related to the Loan or any of the indebtedness and obligations at any time arising thereunder or the security therefor.

2. **Guaranty Continuing and Unlimited; Termination.**  The liability of the Guarantor shall cover all Indebtedness, as that term is defined above, of Borrower

to Bank and shall be unlimited.  This is a continuing Guaranty relating to all Indebtedness, including but not necessarily limited to that Indebtedness arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied . . .

3. **Guarantor's Obligations Independent: Statute of Limitations.**  The obligations of the Guarantor hereunder are independent of the obligations of Borrower and any other guarantor, and a separate action or actions may be brought and prosecuted against the Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions; and the Guarantor waives the benefit of any statute of limitations.
. . .
6. **Waivers.** Guarantor waives any right to require Bank to (a) proceed against Borrower or any other guarantor; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Bank's power whatsoever . . .

(Id. at 22-56).

Each of the 2006 Limited Guaranties, in relevant part, as follows:

1. **GUARANTY.** For valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the-undersigned [Name of Guarantor] (hereinafter called "Guarantor"), jointly and severally unconditionally guarantees and promises to pay to **VISION BANK** (hereinafter called "Bank"), or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC**, an Alabama limited liability company (hereinafter called "Borrower"), to Bank.  The word "Indebtedness" is used herein in its most comprehensive sense and includes a loan to be made by Bank to Borrower within 10 days after the date hereof in the amount of up to Two Million Dollars ($2,000,000.00) (the "Loan") and any and all advances, debts, obligations and liabilities of Borrower to Bank heretofore, now, or hereafter existing, made, incurred, or created, whether voluntary or involuntary, and whether or not arising under, pursuant to or in connection with the Loan Agreement (as hereinafter defined) the Note (as hereinafter defined) and/or any and all other Loan Documents (as hereinafter defined), whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, not limited to but including principal, interest, costs of collection, attorney's fees and all other lawful charges . . . "Loan Agreement" refers to the Loan Agreement for Construction Financing to be dated on or about the date the Loan is first funded between Borrower and Bank, and "Note" refers to the Two Million Dollar ($2,000,000.00) maximum principal amount Promissory Note to be dated on or about the date of the Loan Agreement from the Borrower to the Bank, as the same may from time to time be amended, restated, extended, consolidated, replaced and/or renewed, together with all such amendments, restatements, extensions, consolidations, replacements and/or renewals.  "Loan Documents" (or singularly

a "Loan Document") refers to the Loan Agreement, the Note and all other documents and instruments related to the Note and/or any of the indebtedness and obligations at any time arising thereunder or the security therefor, and including, without limitation to the generality of the foregoing, a Mortgage and Security Agreement from Borrower to Bank dated on or about September 30, 2005, as modified by instruments between Borrower and Bank to be dated the date of the Note, as the said documents and instruments may from time to time be amended, restated, extended and/or consolidated.

2.  **GUARANTY CONTINUING AND UNLIMITED.**  The liability of the Guarantor shall be joint and several, shall cover all Indebtedness, as that term is defined above, of Borrower to Bank and, subject to the applicable limitations described in Section 14 below, shall be unlimited.  This is a continuing Guaranty relating to all Indebtedness, including but not necessarily limited to that Indebtedness arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied . . .

3.  **GUARANTOR'S OBLIGATIONS INDEPENDENT: STATUTE OF LIMITATIONS.** The obligations of the Guarantor hereunder are independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against the Guarantor whether action is brought against Borrower or any other Guarantor or whether Borrower or any other Guarantor be joined in any such action or actions; and the Guarantor waives the benefit of any statute of limitations or other defenses affecting its liability hereunder or the enforcement. . . .

6. **WAIVERS.** GUARANTOR WAIVES ANY RIGHT TO REQUIRE BANK TO (A) PROCEED AGAINST BORROWER OR ANY OTHER GUARANTOR; (B) PROCEED AGAINST OR EXHAUST ANY SECURITY HELD FROM BORROWER; OR (C) PURSUE ANY OTHER REMEDY IN BANK'S POWER WHATSOEVER . . .

14. **LIMITATIONS OF LIABILITY.** The limitations of liability under this Guaranty set forth in this Section 14 do not apply to the Borrower or to any other guarantor of Borrower's Indebtedness to the Bank. Guarantor shall be liable for, and the liability of Guarantor shall be limited to, (i) an amount equal to Guarantor's Specified Portion of the principal of the Note from time to time outstanding; (ii) 100% of all interest on the Loan accrued or accruing at any time, whether before or after acceleration or other maturity of the Note, prior to the payment-in-full by Guarantor of his or her liability under clauses (i), (ii), (iii) and (iv) of this sentence, (iii) 100% of all costs and expenses (including reasonable actual attorney's fees) of collection related or attributable, directly or indirectly, to the enforcement of Guarantor's obligations under this Guaranty, and (iv) 100% of all other costs and expenses (including reasonable actual attorney's fees) of collection relating to all principal, interest and other charges under the Note and/or relating to any other Indebtedness and paid or incurred by the Bank prior to the payment-in-full by Guarantor of his or her liability under clauses (i), (ii) and

(iii) of this sentence.

As used in this Section 14, the "Specified Portion" of Guarantor shall be as set forth below:

| GUARANTOR | SPECIFIED PORTION OF PRINCIPAL |
|---|---|
| [Boihem] | [$240,000.00] |
| [Boihem & Castille] | [$480,000.00 "in the aggregate" (Castille is the only signatory to this specified portion)] |
| [Pidikiti] | [$600,000.00] |
| [Paul Peed] | [$75,000.00] |
| [Raymond Peed] | [$75,000.00] |

15. **MISCELLANEOUS: JOINT AND SEVERAL LIABILITY.** Each Guarantor's liability hereunder shall be joint and several . . . No provision of this Guaranty shall be deemed in conflict with any other provision hereof, of the note or any other Loan Document, and the Guarantor acknowledges that no such provision or any interpretation thereof shall be deemed to diminish the rights of the Bank under the terms and conditions or any other provisions hereof or thereof.

. . .

(Id. at 57-87).

Vision Bank never communicated directly with the Guarantor Defendants, instead delegating the task of preparing and executing the guaranties to its attorneys. (Doc. 85-1 at 9-10, 79-82, 99 – Braswell Depo.). Vision Bank's attorneys sent the guaranties to Joe Raley Builders, developer of the Sandy Creek project; an employee of the company, Barbara Merryman ("Merryman"), was then instructed by Joe Raley ("Raley") to obtain signatures from the guarantors. (Doc. 83-6 at 2, 14 – Raley Depo.).

Castille claims he was never shown either the property loan or the 2005 Unlimited Guaranty, in spite of his requests for copies of both to Merryman and Raley and that he only received "fax pages to sign." (Doc. 85-2 at 9-10 – Castille Depo.). He claims he was "always

under the impression that [he] was signing for the [property loan] note on [his] percentage of ownership of Sandy Creek," that he "asked more than once [that he was] only . . . liable for [his] responsibility of [his] percentage[,]" and that he "was told [by Merryman, Raley, and Boihem] yes, that's what - -  that's what you're doing."  (Id. at 10).  Boihem "remembers signing signature pages" of loan documents sent by Merryman but has "never seen a complete document" until this litigation.  (Doc. 85-3 at 3 – Boihem Depo.).  He claims: "From day one, my understanding is that my ownership, percentage of ownership, is what my guarantee is."  (Id. at 6).  Boihem and Castille both testified that they felt hurried by Merryman and Raley to execute and return their guaranties as quickly as possible.  (Doc. 85-2 at 8; Doc. 85-3 at 4).[6]

Pidikiti testified that she received full copies of the 2005 Unlimited Guaranty, to be executed by her both individually and on behalf of CIP.[7]  After reviewing the documents, she rejected them, advising Merryman and Raley that she would not execute an unlimited guaranty on the $5 million property loan.  Merryman and Raley responded that "the bank must have made a mistake" and that they would have the unlimited guaranties "corrected" and would "send [her] the right papers."  Pidikiti then received new copies of the property loan guaranties from Merryman that she believed limited her and CIP's liability to 20% each of the property loan principal, in proportion to the percentage interest in SC II held by CIP.  Satisfied, Pidikiti executed these limited property loan guaranties and returned them to Merryman, though without retaining copies for herself.  Pidikiti admits that the signature pages of the 2005 Unlimited Guaranties which SEPH seeks to enforce against her and CIP contain her signature but asserts

---

[6] In his response brief, Paul Peed claims he "testified that he does not recall seeing the promissory note before signing the 2005 Guaranty."  (Doc. 89 at 29).  However, the deposition pages cited in support (Paul Peed Depo., pp. 31-32) do not appear in the record.

[7] CIP is a limited liability company formed by Pidikiti.  Its sole asset is a 20% interest in SC II.  (Doc. 83-2 at 13-14 – Pidikiti Depo.).

that the preceding four pages do not contain the 20% liability limitation to which she agreed. Pidikiti only received the signature page for her 2006 Limited Guaranty, which she signed and returned to Joe Raley Builders.  At all times, Pidikiti believed that her liability on both loans was limited to the proportion of her interest in SC II, 20%.  (Doc. 83-2 at 15-26 – Pidikiti Depo.; Doc. 84-1 – Pidikiti Aff.).[8]

Both loans were renewed or modified multiple times over the years – the property loan in April 2006; both loans in April 2007, April/May 2008, and July 2008.  Each renewal or modification was made without obtaining guarantor approval.  During the 2008 loan renewals, Vision Bank was aware that sales for the Sandy Creek development were slow, that development itself was not going as planned, and that the real estate market in general was falling.  Vision Bank also obtained several appraisals of the collateral property – July 2005 ($9.84 million), August 2008 ($5.5 million), June 2009 ($4.25 million), September 2009 ($2,786,800) (obtained by participating bank), October 2011 ($1.07 million).  (Doc. 83-3 – Braswell Depo; Docs. 83-47 – 83-52).  The Guarantor Defendants claim they were never informed of these appraisals.

In July 2009, SC II and all Guarantor Defendants except the Rookery and CIP signed a "Supplement to Loan Documents" relating to the two loans, which stated in relevant part: "Borrower and all of the Included Guarantors acknowledge and agree that . . . the Loans and First Note and Second Note have matured and are in default and are due and payable in full . . ." (Doc. 64-2).  That same month, SC II executed two Amended Promissory Notes in favor of Vision Bank (these are the notes on which SEPH bases its breach-of-contract claims): one for the principal amount of $3,521,057.89 ("amended property loan") (Doc. 64-1 at 5-10) and the other for the principal amount of $1,999,645.83 ("amended construction loan") (id. at 11-16).  As with the original loans, all Defendants other than SC II were named as guarantors for the amended

---

[8] The Court **GRANTS in part** and **DENIES in part** SEPH's motion to strike the contents Paragraph 4 of Pidikiti's affidavit (Doc. 84-1), made in its Reply to Pidikiti and CIP's Response (Doc. 100 at 4 n.1). Only the second sentence of that paragraph is due to be stricken as improper speculation.

property loan (Doc. 64-1 at 5), while all Defendants other than SC II, CIP, and the Rookery were named as guarantors for the amended construction loan (Id. at 11).   New guaranties were not executed for either of the Amended Promissory Notes.

The Amended Promissory Notes are in default, and all defendants have refused SEPH's demand for payment.  (Doc. 64-1 at 2, ¶¶ 6-7 – Harmon Aff.).  SEPH claims that, as of January 9, 2013, the balance due under the amended property loan is $2,827,827.01 ($2,657,442.18 in principal and $170,384.83 in interest, with interest continuing to accrue "at a default rate of Wall Street Prime plus 4.5%, currently 8% ($590.54 per diem)" ), and that the balance due under the amended construction loan is $2,099,379.07 ($1,859,429.94 in principal and $239,949.13 in interest, with interest continuing to accrue "at a default rate of Wall Street Prime plus 4.5%, currently 8% ($413.21 per diem)").  SEPH claims that SC II and all Guarantor Defendants are each liable for the full amount due on the amended property loans, under the terms of the relevant Amended Promissory note and the 2005 Unlimited Guaranties.  SEPH claims that SC II is liable for the full amount due on the amended construction loan pursuant to the terms of the relevant Amended Promissory Note, while the Construction Loan Guarantors are liable for the following amounts of principal and accrued interest pursuant to the terms of their respective 2006 Limited Guaranties:

- Boihem & Castille - $479,949.13 each

- The Peeds - $314,949.13 each

- Pidikiti - $839,949.13

(Id. at 2-3, ¶¶ 8-9).

To date, SEPH has not foreclosed on the collateral real property.

## IV.   Analysis

### a.  Applicable Law

Before addressing the parties' substantive contentions, the Court must decide what law governs the claims in this diversity action.  The claims in this action are based on contract law.

"[A] federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." Manuel v. Convergys Corp., 430 F.3d 1132, 1139 (11th Cir. 2005) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).   Alabama courts follow the traditional conflict-of-law principle of *lex loci contractus*. Lifestar Response of Ala., Inc. v. Admiral Ins. Co., 17 So. 3d 200, 213 (Ala. 2009). Accordingly, in Alabama, contract claims are governed by the laws of the state where the contract was made, unless the contracting parties chose a particular state's laws to govern their agreement. E.g., Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991).  In this action, all loan documents at issue expressly provide that they are to be governed by the laws of Alabama, and no party has argued that the law of any other jurisdiction should apply.  Therefore, the Court will apply Alabama law to the claims in this action.

### b.  Arguments

In the Complaint, SEPH alleges that it "is the holder of the Notes and each Guaranty[,]" that the Defendants "are in default under the Notes and Guaranties[,]" and that it has "demanded payment from" the Defendants, who have "failed to pay."  (Doc. 1 at 4-5, ¶¶ 15, 17, 19).  To prevail on its breach of contract claim, SEPH must establish the following elements: 1) a valid contract binding the parties; 2) its performance under the contract; 3) another party's non-performance; and 4) resulting damages.  See, e.g., Shaffer v. Regions Fin. Corp., 29 So.3d 872, 880 (Ala. 2009); Jones v. Alfa Mut. Ins. Co., 875 So. 2d 1189, 1195 (Ala. 2003); Vision Bank v. Algernon Land Co., L.L.C., 2011 WL 1380062, *7 (S.D. Ala. Apr. 12, 2011); Wachovia Bank, NA v. L&H Investments, LLC, 2010 WL 3825572, *4 (M.D. Ala., Sep. 24, 2010).

Similarly, " '[e]very suit on a guaranty agreement requires proof of the existence of

the guaranty contract, default on the underlying contract by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty.' " Sharer v. Bend Millwork Sys., Inc., 600 So. 2d 223, 225-26 (Ala. 1992) (quoting Delro Indus., Inc. v. Evans, 514 So. 2d 976, 979 (Ala. 1987)).[9] " ' Rules governing the interpretation and construction of contracts are applicable in resolving a question as to the interpretation or construction of a guaranty contract.' " Eagerton v. Vision Bank, 99 So. 3d 299, 304 (Ala. 2012) (quoting Gov't St. Lumber Co. v. AmSouth Bank, 553 So. 2d 68, 75 (Ala. 1989)).

SEPH argues that it is due summary judgment in its favor on its breach-of-contract claims against the Defendants based on the express, "binding, [and ]enforceable" terms of the Amended Promissory Notes, Continuing Guaranties, and Limited Continuing Guaranties, and because certain Defendants have "expressly acknowledged" that they are in default on the notes and guaranties (Doc. 64 at 5, ¶ 5).

SC II does not challenge SEPH's motion. After a review of the SEPH's evidence, the Court finds that SEPH has presented sufficient evidence establishing the existence of valid

---

[9] Moreover, "to recover under a . . . continuing guaranty, an additional element, notice to the guarantor of the debtor's default, must be proved." Sharer, 600 So. 2d at 226 (quotation omitted). However, "[t]he language of the guaranty is controlling in determining whether the holder of the guaranty is under a duty to notify the guarantor of a default by the principal, and notice need not be given when the terms of the guaranty expressly dispense with the need for it." Id. Paragraph 6 of both the 2005 Unlimited Guaranties and the 2006 Limited Guaranties provides, in relevant part: "Guarantor waives all presentments, demands for performance, **notices of non-performance**, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and of the existence, creation, or incurring of new or additional Indebtedness" (emphasis added). The Alabama Supreme Court has held that similar language in a continuing guaranty waived the requirement to provide notice of default. See id. ("The guaranty agreement Sharer executed provides in pertinent part: []'We waive, in connection with the indebtedness and with our obligation under this Guaranty, all presentments, demands for performance, *notices of non-performance,* protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty and of the existence, creation or incurring of any new or additional indebtedness.' [](Emphasis supplied.) . . . Because Sharer waived his right to notice of Sash and Door's nonperformance on the underlying contract, we hold that Bend and Pozzi were not required to prove that they gave Sharer such notice."). As such, because the Guarantor Defendants waived the requirement, SEPH need not show it provided notice to the Guarantor Defendants of SC II's default on the notes in order to enforce the guaranties.

contracts (the Amended Promissory Notes), its performance under the contract (loaning SC II $7 million), SCII's non-performance (default on the notes with outstanding balances due), and its damages (loss of the amount loaned to SC II and not repaid).  Thus, SEPH has met its burden of showing that no genuine issue of material fact exists with regard to its breach-of-contract claims against SCII.  Accordingly, the Court finds that the motion is due to be **GRANTED** as to SC II.  See Fed. R. Civ. P. 56(e)(3).

However, the Guarantor Defendants present a number of arguments in opposition to SEPH's motion.  First, they claim genuine issues of material fact as to whether they are discharged from their obligations under the guaranties due to material alterations made and caused by Vision Bank without their consent – specifically, by Vision Bank's several renewals of the loans without informing the Guarantor Defendants that the value of the collateral property had dropped.  Second, the Guarantor Defendants claim genuine issues of material fact as to whether they are subject to the 2005 Unlimited Guaranties, arguing: 1) there was no meeting of the minds regarding the extent of liability when entering into the 2005 Unlimited Guaranties; 2) enforcement of the 2005 Unlimited Guaranties is unconscionable due to the circumstances in which they were executed; and 3) by their express language, the 2006 Limited Guaranties modified the 2005 Unlimited Guaranties such that the payment obligation on both loans for the Construction Loan Guarantors is limited to that set forth in his or her respective limited guaranty (this argument is also the sole argument made in support of partial summary judgment in their favor by those Guarantor Defendants who have moved for it).  Finally, the Guarantor Defendants argue that, even if they are liable to SEPH under the guaranties, 1) they are due a setoff on any amount owed because SEPH failed to act in a commercially reasonable manner by not foreclosing on the collateral real

property, and 2) SEPH has not presented sufficient evidence to justify either its entitlement

to or the amount of damages.

### i.  Material Alterations to Guaranties

Both loans at issue were secured by a mortgage on real property.  According to the

Guarantor Defendants' factual narrative, at the time the property loan was executed, the

collateral real property was appraised at $9.84 million, thus making the $5 million property loan

"double collateralized."   Both loans were renewed several times over the years – in late

April/early May 2008, July 2008, August/September 2008, and July 2009 (when the Amended

Promissory Notes on which SEPH relies in its Motion for Summary Judgment were executed).

Each of these renewals, according to the Guarantor Defendants, was carried out without

obtaining the consent of the guarantors and in spite of Vision Bank's knowledge that lot sales

and development at the Sandy Creek project were slow and that the overall real-estate market

was in decline.  Moreover, Vision Bank obtained new appraisals of the collateral property prior

to the August/September 2008 and July 2009 renewals showing that the value of the collateral

had dropped, first to $5.5 million and then to $4.25 million.  (Doc. 83 at 15-17.  See also Doc. 85

at 15-17; Doc. 89 at 15-17).

The Guarantor Defendants have cited Eagerton v. Vision Bank, 99 So. 3d 299 (Ala.

2012), reh'g denied, (June 29, 2012), in support of their contention that material changes have

rendered the guaranties unenforceable.   In that case, the Alabama Supreme Court stated as

follows with regard to guaranty contracts:

> The general rule is that "[a] guarantor is discharged if, without his or her consent,
> the contract of guaranty is materially altered." 38A C.J.S. *Guaranty* § 97, at 704
> (2008). In Medley v. SouthTrust Bank of the Quad Cities, 500 So. 2d 1075 (Ala.
> 1986), this Court stated that any alteration beyond the terms of the guaranty
> contract, regardless of injury or benefit to the guarantor, is fatal:
>
>> "It is fundamental that the liability of a guarantor will not be extended by
>> implication beyond the terms of his contract. *It matters not that he or she
>> sustains no injury or even that it may be for his or her benefit.* This Court
>> has said that the guarantor 'has a right to stand upon the very terms of his

> contract, and if he does not assent to any variation of it, and a variation is made, it is fatal.' <u>Russell v. Garrett</u>, 208 Ala. 92, 96–97, 93 So. 711 (1922), quoting <u>Manatee County State Bank v. Weatherly</u>, 144 Ala. 655, 39 So. 988 (1905). <u>See</u>, <u>also</u>, <u>Furst v. Shows</u>, 215 Ala. 133, 110 So. 299 (1926)."

> 500 So. 2d at 1081 (emphasis added). In other words, the general rule regarding guaranties is so strict that courts will not stop to inquire whether any alteration was injurious or beneficial to the guarantor.

<u>Eagerton</u>, 99 So. 3d at 305-06.

The Guarantor Defendants contend there is a genuine issue of material fact as to whether the several loan renewals by Vision Bank "constituted material changes to the loan agreements and guaranties because of the drastic drop in the value of the collateral securing the Sandy Creek loan." Should these renewals constitute material changes, the guaranties would be unenforceable "[b]ecause Vision Bank did not obtain consent agreements from the Defendants affirming the guaranties . . . " (Doc. 83 at 17. <u>See also</u> Doc. 85 at 17; Doc. 89 at 17).

SEPH argues that <u>Eagerton</u> is distinguishable from the present case and that the terms of the guaranties in this case make any drop in the value of the loan collateral irrelevant to their enforceability. The Court agrees. <u>Eagerton</u> also involved guaranties related to two loans, "the original loan" and "the second loan." Whereas other guarantors had executed "unlimited" guaranties with regard to the two loans, "[o]n each of their guaranty contracts, [Appellants ]the Eagertons . . . limited their liability to 'indebtedness' arising out of . . . the original loan, as well as any 'extensions, renewals or replacements thereof.' " 99 So. 3d at 305. With the participation of the lender, but not the Eagertons, the original loan was later consolidated with the second loan in a Chapter 11 bankruptcy proceeding, and the lender sought payment from the Eagertons on the consolidated loan pursuant to their guaranty contracts. <u>Id.</u> at 302-03. The Alabama Supreme Court, however, agreed with the Eagertons' argument that "the consolidation of the original loan

with the second loan[] created a new 'indebtedness' and/or contract not encompassed by their guaranty contracts" and "that the creation of this new indebtedness, without their knowledge or consent, operated to discharge them from any further obligations under their guaranty contracts." Id. at 306.  Specifically, the court found that the bankruptcy loan consolidation constituted a "modification," rather than an "extension[], renewal[] or replacement[,]" of the original loan.  As the Eagertons "did not guarantee . . . the original loan[] 'with modifications[,]' . . . once the original loan was modified pursuant to [the] Chapter 11 reorganization, the Eagertons were discharged from any further obligations under their guaranty contracts securing the original loan." Id. at 307.

In this case, no "new indebtedness" was created by the repeated renewal of the loans. The decline in value of the collateral property had no effect on the indebtedness owed by the Guarantor Defendants.  As the express terms of the guaranties provide, SEPH is under no obligation to use the collateral property to satisfy the loans before seeking payment from the guarantors.  Both the 2005 Unlimited Guaranties and 2006 Limited Guaranties state: "It is the intent hereof that the obligations of the Guarantor hereunder shall be and remain unaffected (a) by the existence or non-existence, validity or invalidity of any pledge, assignment or conveyance given as security . . ." (E.g., Doc. 64-1 at 18, ¶ 4, 63, ¶ 4).  Moreover, in executing their respective guaranties, each Guarantor Defendant expressly 1) "authorize[d] [Vision ]Bank, without notice or demand and without affecting his liability hereunder, from time to time to . . . (b) take and hold security for the payment of the Guaranty or the Indebtedness guaranteed, and exchange, modify, enforce, waive and release any such security . . ." (e.g., id. at 18, ¶ 5, 63, ¶ 5 (emphasis added)), and 2) "waive[d] any right to require Bank to . . . (b) proceed against or exhaust any security held from Borrower . . ." (e.g., id. at 18, ¶ 6, 63, ¶ 6).

19

Under these terms, regardless of whether the collateral property increases or decreases in value, SEPH is entitled to forego foreclosure on the collateral and instead seek full payment on the loans from the Guarantor Defendants. As such, "the liability of [the] guarantor[s] [has] not be[en] extended by implication beyond the terms of [their] contracts" by the changing value of the collateral property. Eagerton, 99 So. 3d at 306 (quotation omitted). See also John Glenn *et al.*, 38A C.J.S. Guaranty § 97 (2013) ("Whether an alteration in a guaranty contract is material depends upon whether after the alteration it expresses the same contract, and whether it will have the same operation and effect. If the alteration in a guaranty changes the guarantor's liability it is material. . . . It has been said that an alteration of a guaranty agreement is not 'material,' as basis for discharging the guarantor, unless the guarantor is placed in the position of being required to do more than his or her original undertaking." (footnotes omitted)). Therefore, the Guarantor Defendants have failed to demonstrate material alterations to the guaranties.

### ii.  Mutual Assent ("Meeting of the Minds")

"[A] guaranty, as other contracts, is complete when the minds of the parties to the guaranty meet in mutual assent . . ." William R. Hubbell Steel Corp. v. Epperson, 679 So. 2d 1131, 1133 (Ala. Civ. App. 1996) (citing Barnett Bank v. Marable, 385 So. 2d 66 (Ala. Civ. App. 1980)). All Guarantor Defendants argue that there are genuine issues of material fact as to whether mutual assent ever existed in their execution of the 2005 Unlimited Guaranties.

First, all Guarantor Defendants assert that, when executing the 2005 Unlimited Guaranties, they believed they each would be liable only for a percentage of the loan amount equal to their respective ownership interests in SC II. However, as SEPH correctly argues, "[a] guarantor cannot defeat the plain terms of the agreement by stating that he did not intend to obligate himself to the provisions of the guaranty agreement." Gov't St. Lumber Co., Inc. v. AmSouth Bank, N.A., 553 So. 2d 68, 75 (Ala. 1989). The Peeds, the Rookery, Boihem, and Castille also assert that they did not consent to the unlimited terms of the 2005 Unlimited

Guaranties because they never received copies of either that guaranty or the property loan and instead merely executed signature pages for those guaranties.  These claims too are unavailing.  "Alabama law provides that []'in the absence of fraud or misrepresentation, a party is bound by the terms of a contract, even if he fails to read it.  The law is equally clear that ordinarily when a competent adult, having the ability to read and understand an instrument, signs a contract, he will be held to be on notice of all the provisions contained in that contract and will be bound thereby.' "  Brown v. Brown, 26 So. 3d 1210, 1214 (Ala. Civ. App. 2007) (quoting Power Equip. Co. v. First Ala. Bank, 585 So. 2d 1291, 1296 (Ala. 1991) (internal citations omitted)). [10]

The Peeds, the Rookery, and Boihem do not argue or present evidence that they were induced to sign the signature pages through either fraud or misrepresentation.  Castille, however,

---

[10]    As SEPH correctly argues, Castille and Boihem's claims of feeling hurried by Merryman and Raley to sign their guaranties do not excuse their failure to read those guaranties.  See BSI Rentals, Inc. v. Wendt, 893 So. 2d 1184, 1192 (Ala. Civ. App. 2004) ("[I]n Ex parte Perry, 744 So. 2d 859 (Ala. 1999) (Hooper, C.J., with two Justices concurring and two Justices concurring in the result), the main opinion noted that a party is responsible for reading a contract to which he has committed himself upon signing, irrespective of whether the party felt 'hurried.' 744 So. 2d at 863. The signing party is ultimately responsible for his acquiescence to a written agreement and, therefore, is in control of the contractual process. If he feels 'hurried,' in order to guard against any potential liability, it is his duty to slow or stop the process until he has sufficient time to thoroughly read the agreement.").

It is also worth noting that the signature pages for the 2005 Unlimited Guaranties contained a portion of the contract language, putting these Guarantor Defendants on notice that there were additional terms to the guaranties in proceeding pages.  The Court finds persuasive the reasoning from other jurisdictions that a party who claims to have received and signed only the last page of a contract is not excused for failing to request and read the entire contract.  See Bibbs v. House of Blues New Orleans Rest. Corp., Civ. A. No. 10-82, 2011 WL 1838783, at *5-6 (E.D. La. May 13, 2011) ("Even had plaintiffs received and signed only the last pages of the agreement to arbitrate, they are presumed to have read and consented to the entire terms of the agreements." (applying Louisiana law, but also relying on the reasoning in Gray v. Rent-A-Ctr. W., Inc., No. CV 06-1058-HU, 2007 WL 283035, at *5 (D. Or. Jan. 24, 2007), rev'd, 314 F. App'x 15, prior opinion vacated and appeal dismissed, 295 F. App'x 155 (9th Cir. 2008) ("In Oregon, a party is presumed to be familiar with the contents of any document that bears the person's signature. Given plaintiff's signature on the agreement, and given the language on the page plaintiff did sign, the agreement is not unenforceable as unconscionable. Even assuming the validity of his allegation that he did not receive the preceding pages, plaintiff's failure to request those pages and read them is not a defense to enforcement." (citation and quotations omitted)) and DeBono v. Washington Mut. Bank, No. 05 CIV.10333 RJH, 2006 WL 3538938, at *2 (S.D.N.Y. Dec. 8, 2006) ("[I]t is undisputed that plaintiff signed the Agreement. Thus, even if he only received the last page, plaintiff is bound by the conditions of the Agreement once he signed it. Under New York law-absent fraud, duress, or other wrongful act-a party who signs or accepts a written contract ... is conclusively presumed to know its contents and to assent to them." (quotation omitted)).))

does.  "An essential element of any fraud claim is that the [claimant] must have reasonably relied on the alleged misrepresentation . . . [R]eliance in the form that the misrepresentation is acted on by the opposite party is an essential element of fraud in Alabama."  Hunt Petroleum Corp. v. State, 901 So. 2d 1, 4 (Ala. 2004) (citation and quotations omitted).  "Moreover, the burden is on the party alleging fraud to prove by substantial evidence the element of reliance.  Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."  Id. (citation and quotations omitted).

Castille testified at deposition that he "asked more than once [that he was] only . . . liable for [his] responsibility of [his] percentage[,]" and that he "was told [in conversations with Merryman, Raley, and Boihem] yes, that's what - -  that's what you're doing."  (Doc. 85-2 at 10).  However,

> Alabama law is clear that [Castille] cannot blindly rely on oral assertions or representations and fail to review the written terms of a contract associated with a transaction. See, e.g., Eley[ v. Travelers Ins. Cos., Inc.], [No. 2:12cv144–WC, ] 2011 WL 671681, at *12 [(M.D. Ala. Feb. 18, 2011) ]("The mere fact that a plaintiff is told one thing is not enough to make reliance upon it reasonable; rather, a plaintiff has a duty to read associated written documents and to investigate facts that should provoke inquiry."). See also AmerUs Life Ins. Co. v. Smith, 5 So. 3d 1200, 1208 (Ala. 2008) ("[A] plaintiff who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representations that contradict the written terms in the documents."); Wright Therapy v. Blue Cross, 991 So. 2d 701, 706 (Ala.2008) ("Under the ['reasonable-reliance'] standard, a person cannot blindly rely on an agent's oral representations to the exclusion of written disclosures in a contract.") (quoting Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So. 2d 777, 783–84 (Ala. 2000)).

Wells Fargo Bank, N.A. v. Trotman, No. 2:12CV144-WC, 2013 WL 1613243, at *4 (M.D. Ala. Apr. 15, 2013) (Capel, M.J.).  Moreover, there is no evidence that Merryman, Raley or Boihem were acting as agents of Vision when they allegedly falsely represented the terms of the guaranty.    Thus, such misrepresentations, even if proven, would not support a reasonable reliance defense.

22

Unlike the other Guarantor Defendants, Pidikiti and CIP claim that the guaranties they executed in 2005 and 2006 were not the Unlimited Guaranties and the Limited Guaranty SEPH now asserts against them. According to Pidikiti, she rejected Vision Bank's original unlimited guaranty for the property loan and insisted on executing a limited guaranty.  She was then provided a new guaranty that she determined limited her liability to 20% of the property loan, which she then executed and returned (without retaining a copy).  Pidikiti claims that "[t]he 2005 property loan guaranty which is relied upon by SEPH, except for the execution page, is not the document that she executed."  (Doc. 83 at 19.  See also Doc. 83-2 at 15-26 – Pidikiti Depo.; Doc. 84-1 (Pidikiti Aff.) at 1-3, ¶¶ 2-4)).

SEPH argues that Pidikiti and CIP "cannot create a genuine issue of material fact regarding the alleged removal and substitution of four pages in the 2005 guaranty[,]" citing Montgomery Elevator Co., Inc. v. Nutmeg Ins. Co., 29 F. Supp. 2d 761 (S.D. Tex. 1998). However, due to the unique circumstances of that case, where the credibility of the non-moving party was considered on summary judgment, the Court finds Montgomery Elevator not to be persuasive.  The Court finds that Pidikiti and CIP have presented sufficient evidence to establish that genuine issues of material fact exist as to whether the 2005 Guaranty and 2006 Limited Guaranty, relied upon by SEPH, are valid and binding contracts. [11]  The Peeds, Boihem, the Rookery, and Castille, however, have presented no such evidence, and the Court finds no genuine issue of material fact as to their assent to the terms of their respective 2005 Unlimited Guaranties.

### iii.  Unconscionability

All Guarantor Defendants claim that the respective guaranty paperwork they executed was delivered to them by and returned to Merryman.  Such circumstances, they argue, render this action analogous to ITT Industrial Credit Co. v. Alex Cooley's Ballroom, Inc., 726 F.2d 1559 (11th Cir. 1984), in which the Eleventh Circuit found enforcement of certain guaranties to be

---

[11] When considering a summary judgment, the non-movant is to be believed and all justifiable inferences are drawn in her favor.  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d at 998.

unconscionable based on the circumstances by which they were obtained. The relevant facts in

ITT were succinctly set out as follows:

> Appellant (ITT) on February 15, 1979, made a loan to Stephen Alexander Cooley, an entertainment promoter, and two corporations operated by him . . .

> In addition to [a limited guaranty by another individual] ITT unilaterally, as an afterthought, and without negotiating with anyone, prepared a guaranty on their standard form to be signed by Cooley's wife Virginia (a student nurse) and his mother (a retired telephone operator). One Shela Baird, of ITT's credit department, procured presentation of the guaranty document to the Cooley women by one Leslie Taylor, an employee of Alex Cooley. This document was not accompanied by any of the cognate papers setting forth the terms of the loan which the ladies were being asked to guarantee. It was "open-ended" and did not specify any dollar amount of liability under the loan . . .

> Virginia and Frances Cooley did sign (without reading it) the document brought to them by Leslie Taylor, who had from time to time brought papers which Alex Cooley wanted them to sign. They supposed this was another such document coming from their husband or son, and it was their practice to sign such papers routinely, relying upon Alex's business judgment.

> They did not know, when Leslie Taylor brought this particular guaranty document, that she was ITT in sheep's clothing. They did not know that ITT's Baird, rather than Alex Cooley, wanted them to sign, and was "short-circuiting" normal channels by taking it directly to the women rather than leaving it at Cooley's office for his scrutiny and approval before it was sent on to them for signature. Had they known it was ITT who wanted them to sign, they would not only have read it but would have withheld action until after consulting Alex.

> On April 30, 1979, an extension agreement was executed. On this occasion the same deceptive procedure was again employed of having Leslie Taylor, as ITT in sheep's clothing, bring the document to Virginia Cooley and Frances Cooley to procure their signatures.

726 F.2d at 1560-61.

> "On these facts[,]" the Eleventh Circuit held:

> [T]he District Court correctly found that the ladies had been "misled and overreached to such an extent that the contract is unconscionable." He properly concluded, after careful consideration of all the circumstances, that "enforcement of the guaranty agreements against the Cooley women would lead to an unconscionable result."
> . . .
> As well stated in appellee's brief (p. 8):

> ITT induced them through chicanery into providing their signature and
> ITT did not have Leslie Taylor deliver to the Appellees the documents
> describing the loan they were guaranteeing .... The doctrine of
> unconscionability applies to circumstances such as these where it would
> be grossly inequitable to allow ITT to benefit from its own misleading
> conduct.... It is undisputed that the Appellees' (sic ) did not read the
> agreements because of the artifice of the appellant[ . . .]

Id. at 1561.

The determinative facts of ITT are readily distinguishable from this case.  Unlike the Cooley ladies, the Guarantor Defendants do not claim that they executed the guaranties without reading them based solely on the perceived business judgment of Raley or any other person, much less that they routinely signed contracts in such a manner.  Moreover, the ITT court found that the lender, in having the unlimited guaranties delivered directly to the Cooley ladies, had "short-circuited" the normal process of business dealings among the parties, which was to have Alex Cooley scrutinize and approve documents before the ladies would sign.   In this action, no evidence has been presented of similar "short-circuiting" or "chicanery" by Vision Bank, which dealt with the Guarantor Defendants primarily through Raley.

In Alabama, "an unconscionable contractual provision is defined as a provision such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other."  Leeman v. Cook's Pest Control, Inc., 902 So. 2d 641, 645 (Ala. 2004) (quotations omitted).  Leeman further stated:

> In Layne v. Garner, this Court first undertook to announce an explicit standard for
> determining whether a contract or contractual provision is unconscionable:
>
>> "In addition to finding that one party was unsophisticated and/or
>> uneducated, a court should ask (1) whether there was an absence of
>> meaningful choice on one party's part, (2) whether the contractual terms
>> are unreasonably favorable to one party, (3) whether there was unequal
>> bargaining power among the parties, and (4) whether there were
>> oppressive, one-sided, or patently unfair terms in the contract."

> 612 So.2d [404,] 408[ (Ala. 1992)]. "For ease of discussion," this Court has at
> times reduced the <u>Layne v. Garner</u> test to two essential elements: "(1) terms that
> are grossly favorable to a party that has (2) overwhelming bargaining power."
> <u>American Gen. Fin., Inc. v. Branch</u>, 793 So. 2d 738, 748 (Ala. 2000).

<u>Id.</u>  There is no evidence that any defendant was "unsophisticated and/or uneducated," that the

terms are grossly unfair to a party, or that Vision Bank had overwhelming bargaining power.

Furthermore, although Alabama law "recognizes a distinction between 'substantive

unconscionability' and 'procedural unconscionability[,]' " <u>see id.</u>, the Guarantor Defendants

have failed to present any evidence of deception or refusal to bargain by Vision Bank.  <u>Id.</u>

(quotations omitted).  As such, the Court finds the Guarantor Defendants' argument as to

unconscionability to be without sufficient evidentiary support.

### iv.  2006 Limited Guaranties Modify 2005 Unlimited Guaranties

Even if the guaranties are enforceable, the Construction Loan Guarantors argue that they

are liable only for the amounts provided in their respective 2006 Limited Guaranties, which by

their "plain language . . .  supercede[]" the 2005 Unlimited Guaranties "by limiting the

obligations of the guarantors <u>on both</u> loans to a specified principal amount."  (<u>E.g.</u>, Doc. 83 at

20-21).  The Construction Loan Guarantors present this contention both in opposition to SEPH's

motion and as their sole argument in support of their own motions.  After a close reading of the

relevant language in the guaranties, the Court finds that the Construction Loan Guarantors'

motions for summary judgment are due to be **DENIED** as to this issue.

The Construction Loan Guarantors argue that the parties mutually assented to forego the

2005 Guaranties by executing the 2006 Limited Guaranties, the express terms of which, they

argue, modify or supercede the 2005 Unlimited Guaranties.

In Alabama, "[p]arties may modify the terms of their agreement and 'if the terms of a

subsequent agreement contradict the earlier agreement, the terms of the later agreement

prevail.'"  <u>McLemore v. Hyundai Motor Mfg. Ala., LLC</u>, 7 So. 3d 318, 332-33 (Ala. 2008)

(quoting <u>Cavalier Mfg., Inc. v. Clarke</u>, 862 So. 2d 634, 641 (Ala. 2003) (plurality opinion)).  <u>See</u>

26

also RRE Crestwood Holding, LLC v. CV Apartments, LLC, No. 2:11-CV-01466-AKK, 2012 WL 3139588, at *4 (N.D. Ala. July 26, 2012) ("[W]hen 'two agreements cover *the same subject matter* and include inconsistent terms, the later agreement supersedes the earlier agreement.' " (quoting Cavalier Mfg., 862 So. 2d at 641) (plurality opinion) (emphasis added) (quoting for proposition CMI Int'l, Inc. v. Intermet Int'l Corp., 251 Mich. App. 125, 130, 649 N.W.2d 808, 812 (2002))). "Both parties must mutually assent to a modification." Ex parte Amoco Fabrics & Fiber Co., 729 So. 2d 336, 340 (Ala. 1998). See also Whorton v. Bruce, 17 So. 3d 661, 665 (Ala. Civ. App. 2009) (" '[I]t is an elementary principle of contract law that in order for a contract to be validly modified, there must be mutual assent to the new terms by both parties. ... It is incumbent on the party claiming the modification to show that the new agreement was mutually agreed to.' " (quoting Wiregrass Constr. Co. v. Tallapoosa River Elec. Coop., Inc., 365 So. 2d 95, 98 (Ala. Civ. App. 1978))). Though the Construction Loan Guarantors spend significant page space arguing ambiguity in support of their contention that the 2006 Limited Guaranties supersede the 2005 Unlimited Guaranties, " '[i]t is a general rule that a party claiming that a contract modifies a prior contract must show that the later contract is definite and certain as to the terms of modification, and the modification extends only so far as the terms are definite, certain and intentional.' " McLemore, 7 So. 3d at 333 (quoting Johnson-Rast & Hays, Inc. v. Cole, 310 So. 2d 885, 889 (Ala. 1975) (citing 17 C.J.S. Contracts § 347, p. 424)).

In both the 2005 Unlimited Guaranties and the 2006 Limited Guaranties, each guarantor "unconditionally guarantees and promises to pay to **VISION BANK** . . . or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC** . . . to Bank." As the Construction Loan Guarantors point out, "Indebtedness" as defined in the 2006 Limited Guaranties is very broad and can be read to encompass the property loan as well as the construction loan, especially when compared with the more confined definition of "Indebtedness" contained in the 2005 Unlimited Guaranties.

"Indebtedness" in the 2005 Unlimited Guaranties specifically "pertain[s] to" the $5

million property loan and "includes any and all advances, debts, obligations and liabilities of [SC II] to [Vision ]Bank heretofore, now, or hereafter existing, made, incurred, or created, . . . arising under, pursuant to or in connection with" the $5 million property loan.  In contrast, "Indebtedness" in the 2006 Limited Continuing Guaranties "includes" the construction loan as well as "any and all advances, debts, obligations and liabilities of [SC II] to [Vision ]Bank **heretofore**, now, or hereafter **existing**, made, incurred, or created, . . . **whether or not** arising under, pursuant to or in connection with" the construction loan.  The 2005 property loan can be considered an "advance[], debt[], obligation[] [or] liability[y] of [SC II] to [Vision ]Bank heretofore . . . made, incurred, or created, . . . not arising under, pursuant to or in connection with"  the construction loan.   As such, the 2006 Limited Guaranties could be read to modify the terms of the 2005 Unlimited Guaranties by limiting the liability of each Construction Loan Guarantor for "any and all Indebtedness" of SC II to Vision Bank "heretofore . . . or hereafter existing, made, incurred, or created," including the original property loan and the amended property loan.

SEPH "assum[es] *arguendo* that the language in the 2006 limited guaranty [is] broad enough to overlap with the underlying debt covered by the 2005 guaranty" but argues that "[t]here is nothing in the 2006 guaranty that purports to revoke or supplant the 2005 unlimited guaranty of" the property loan.  In support, SEPH cites <u>Ferguson v. Cadle Co.</u>, 816 So. 2d 473, 476 (Ala. 2001), in which it claims "the Supreme Court of Alabama has expressly held that a later 'guaranty cannot, in and of itself, negate the earlier guaranty.' " That holding, however, does not have the broad application SEPH argues; it is instead limited to the specific facts of that case, where the earlier guaranty contained express language stating that "the only way to revoke that guaranty [wa]s by written notice actually received by the Bank."

Ferguson, 816 So. 2d at 476 (quotation marks omitted).  Because the record in Ferguson contained no evidence of such a condition being met, the court found that the later guaranty did not revoke or replace the earlier one.  This result is consistent with the Alabama Supreme Court's holding that "a provision in a continuing guaranty agreement that requires a particular method of revocation must be given effect as written . . ."  Barnett Millworks, Inc. v. Guthrie, 974 So. 2d 952, 957 (Ala. 2007).  SEPH does not point to any such provision in any of the guaranties at issue.  The other cases to which SEPH cites in support of this contention are not relevant, as they do not address contract modification under Alabama law.  See Alton Banking & Trust Co. v. Schweitzer, 121 Ill. App. 3d 629, 634 (1984) (rejecting theories of merger and novation under Illinois law in finding that a later guaranty did not replace a previous one); RRE Crestwood, 2012 WL 3139588, at *4 (finding that Alabama merger doctrine did not apply to three guaranties because each related to a different obligation).

However, "[t]erms of a written instrument should be construed *in pari materia* and a construction adopted that gives effect to all terms used."  Sullivan, Long & Hagerty v. S. Elec. Generating Co., 667 So. 2d 722, 725 (Ala. 1995).  A review of the document indicates that the express terms of the 2006 Limited Guaranties do not allow for modification of the guarantors' liabilities in the 2005 Unlimited Guaranties.  Specifically, paragraph 15 of each 2006 Limited Guaranty provides: "No provision of this Guaranty shall be deemed in conflict with … **any other Loan Document**, and the Guarantor acknowledges that no such provision or any interpretation thereof shall be deemed to diminish the rights of the Bank under the terms and conditions of any other provisions … **thereof**."  (Doc. 64-1 at 57-87 (emphasis added)).  The term "Loan Documents," as set out in paragraph 1 of each of the 2006 Limited Guaranties, refers to, *inter alia*, "**all other documents and instruments related to** the Note and/or any of the

indebtedness and obligations at any time arising thereunder or the security therefor, and **including**, without limitation to the generality of the foregoing, **a Mortgage and Security Agreement from Borrower to Bank dated on or about September 30, 2005**, as modified by instrument between Borrower and Bank to be dated the date of the Note, as the said documents and instruments may from time to time be amended, restated, extended and/or consolidated." (Id. (emphasis added)).

The Amended Promissory Note for the 2005 property loan states that its indebtedness is secured by a "certain Mortgage and Security Agreement . . . dated on or about September 30, 2005, from Borrower to Bank . . ." (Id. at 5-6, ¶ 3).   It also states that it "has been guarantied by [the Guarantor Defendants and others] pursuant to separate continuing guaranties heretofore executed by said Guarantors . . ." (Id. at 5, ¶ 3).   As such, the 2005 Unlimited Guaranties can plainly be considered "documents or instruments related to . . . [the] Mortgage and Security Agreement from Borrower to Bank dated on or about September 30, 2005," *supra*, and are therefore "Loan Documents" under the 2006 Limited Guaranties.   Because the provisions of any such "Loan Document" cannot be "deemed in conflict with" the provisions of the 2006 Limited Guaranties, nor can the provisions of the 2006 Limited Guaranties be read to "diminish the rights of" SEPH under any "Loan Document," *supra*, the terms of the 2006 Limited Guaranties do not "contradict," and therefore do not modify or supercede, the terms of the 2005 Unlimited Guaranties, see McLemore, 7 So. 3d at 332-33.

Therefore, the Construction Loan Guarantors' motions for summary judgment are due to be **DENIED**.

### v. Commercially Unreasonable Behavior

The Guarantor Defendants also argue that SEPH is not entitled to recover the full amount due on the loans because it (and Vision Bank) acted in a commercially unreasonable

manner by failing to foreclose on the collateral property, even though it was aware that the property's value was declining.   Alabama law states: "Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."   Ala. Code § 7-9A-610(b).   However, "a secured party's failure to have conducted a sale or disposition of collateral in a commercially reasonable manner does not absolutely bar the secured party from recovering the deficiency between the amount due on the secured debt and the proceeds of the sale or disposition of the collateral. Rather, the debtor is entitled to set off any loss proven at trial against the deficiency owed to a secured party."  Folks v. Tuscaloosa Cnty. Credit Union, 989 So. 2d 531, 535 (Ala. Civ. App. 2007) (citing Stone v. Cloverleaf Lincoln-Mercury, Inc., 546 So. 2d 388, 390 (Ala. 1989)).  See also Abston v. Cent. Bank of the S., 492 So. 2d 1298, 1300 (Ala. 1986) ("[A] debtor may be entitled to a reduction in the amount of a deficiency remaining after the sale of collateral as damages for a creditor's commercially unreasonable behavior in the sale of repossessed collateral." (citing Valley Mining Corp., Inc. v. Metro Bank, 383 So. 2d 158 (Ala. 1980)).

The Guarantor Defendants have cited no Alabama case law applying this concept either to real property collateral or to behavior occurring outside the actual "sale or disposition of collateral," and the Court's own research has uncovered none.  As has been discussed *supra*, the Guarantor Defendants expressly waived any requirement of SEPH to foreclose on the collateral property.  Moreover,

> compelling a lender to foreclose on collateral instead of suing to recover unpaid debts (in the absence of any contract provision imposing such a condition precedent) would stretch the concept of mitigation beyond all reasonable boundaries. See, e.g., SE Property Holdings, LLC v. Foley, 2012 WL 1382523, *4 (S.D. Ala. Apr. 20, 2012) (rejecting argument that lender had a duty to mitigate damages by foreclosing on property rather than allowing interest to accrue at default rate); REL Development, Inc. v. Branch Banking & Trust Co.,

699 S.E.2d 779, 781–82 (Ga. App. 2010) (where contract provisions give lender the right to choose between foreclosure and filing suit, "the bank was under no duty to appellant to proceed against the collateral to collect payment," such that "the bank had no obligation to mitigate its damages in relation to the collateral"); Fifth Third Bank v. Canvasser, 2011 WL 2347707, *2 (Mich. App. June 14, 2011) (finding no merit to defendants' contention that plaintiff lender breached duty to mitigate by suing instead of foreclosing on collateral, reasoning that "plaintiff suffered damages as soon as the promissory notes were defaulted on; foreclosure is merely one possible remedy, and under the contracts, plaintiff had its choice of remedies. Electing one rather than another does not *per se* constitute a failure to mitigate."). Besides, **Alabama courts have expressly declined to impose any such mandatory duty of foreclosure in the mortgage context.** See Triple J Cattle, Inc. v. Chambers, 551 So. 2d 280, 282 (Ala. 1989) ("Upon a default by the mortgagor, the mortgagee has three remedies, and he may pursue any one or all of them until the debt is satisfied.... He is not required to foreclose the mortgage first, but may bring his action on the note alone.").

Whitney Bank v. Point Clear Dev., LLC, Civ. A. No. 11-0657-WS-M, 2012 WL 2277597, at *5

(S.D. Ala. June 18, 2012) (Steele, C.J.) (emphasis added).

As such, the Guarantor Defendants' argument that they are due a set off for commercially unreasonable behavior is without merit.

### vi.  Entitlement to Collect on the Loans

The Guarantor Defendants argue that SEPH "fail[s] to present sufficient undisputed facts in support of [its] claims - - particularly in regards to damages and whether SEPH has the contractual authority or standing to pursue the breach of contract claims."  (Doc. 83 at 29; Doc. 85 at 26; Doc. 89 at 26).  First, they point to testimony of Alexander Braswell, SEPH's corporate representative under Rule 30(b)(6) of the Federal Rules of Civil Procedure, stating that Vision Bank sold $4.5 million of the $5 million property loan to participating banks, retaining $500,000 (10%) of the original principal.  Pursuant to this testimony, the Guarantor Defendants argue that "SEPH has supported its motion with no evidence of its legal entitlement to recover damages on a contract claim for amounts owned by participating banks[,]" claiming that the 2005 Unlimited Guaranties "are silent as to participating banks and the rights of Vision Bank (or SEPH) to recover principal sold to participating banks from guarantors."   (Doc. 85 at 26-27.  See also

32

Doc. 83 at 29-30;; Doc. 89 at 26-27).  In response, SEPH asserts:

> As between SEPH and the Defendants, the parties in privity to the contracts at issue, the guaranty agreements expressly define the amounts that Defendants owe to SEPH. Any agreements that SEPH may have made with participant banks for the sale of portions of the underlying debt are not at issue in this case, nor is any contractual obligation that SEPH may have with the participant banks concerning repayment of the loan proceeds. Issues relating to the division of proceeds between SEPH and the participant banks are irrelevant to SEPH's motion for summary judgment as to the breach of contract by the Defendants.

(Doc. 98 at 8; Doc. 99 at 8; Doc. 100 at 13).

Notwithstanding these assertions, the loan participation agreements for the property loan each provide: "Originating Bank [Vision Bank] shall, subject to the provisions of this Agreement, retain all rights with respect to enforcement, collection, and administration of the Loan and the security underlying the Loan therefore, in accordance with the terms of this Agreement."  (Docs. 101-35 – 101-38, ¶ 16.c.).  The Guarantor Defendants have not identified any language in the participation agreements that would otherwise limit SEPH's right to claim the full amount owed on the property loan.

The Guarantor Defendants also argue that SEPH has failed to show that it has been assigned or otherwise "stepped into the shoes" of Vision Bank in relation to the guaranties or that it is otherwise the successor in interest to those rights.  However, SEPH has presented 1) the affidavit of Karen Harmon, assistant secretary of SEPH, who states that SEPH is the "successor in merger for Vision Bank" (Doc. 64-1 at 1,¶ 1), and 2) a certified copy of the "Certification of Merger and Transfer" between Vision Bank and SEPH (Docs. 98-1, 99-1, 100-1).   The Guarantor Defendants merely fault Harmon's affidavit statement for being "conclusory," and they have not moved to strike or otherwise challenge the Certification of Merger and Transfer, which was submitted by SEPH with its Replies.  The Court finds that either of these pieces of evidence is sufficient to prove the point asserted – that SEPH is the successor in merger of Vision Bank and that the Guarantor Defendants have presented insufficient evidence to create an issue of fact.  Under Alabama law, "all rights, immunities, and franchises of the merged entities,

of a public as well as a private nature; and all debts and obligations due the merged entities, are taken and deemed to be transferred and vested in the surviving or resulting entity without the necessity of any deed or other instrument of conveyance to the surviving or resulting entity . . ." Ala. Code § 10A-1-8.02(i)(2).  Thus, the Court finds there is no genuine issue of material fact as to SEPH's entitlement to enforce the loans made by Vision Bank in this case.

### vii.   Proof of Damages

The Guarantor Defendants also argue that SEPH has failed to show that the amounts it claims due under the Amended Promissory Notes have been accurately calculated.  SEPH has submitted the affidavit testimony of Karen Harmon (Doc. 64-1 at 2-3, ¶¶ 8-10) as evidence of those amounts.   Harmon avers that such testimony is based on "personal knowledge of the matters set forth" in the affidavit and that she is "competent to make th[e] Affidavit."  (Doc. 64-1 at 1, ¶ 1).  In support of their contention that such evidence of damages is insufficient, the Guarantor Defendants cite to testimony by Braswell, SEPH's corporate representative, who at deposition was unfamiliar with Harmon's affidavit, could not speak to how the amounts due stated in the affidavit were reached, and could not say how other payments had been applied to the loans.  (Doc. 85-1 at 86-92).  Braswell's lack of person knowledge of such matters, however, does not negate Harmon's stated personal knowledge concerning those matters, and the Guarantor Defendants have submitted no evidence of their own to rebut Harmon's testimony.

### V.     Conclusion

In accordance with the foregoing analysis, it is **ORDERED** as follows:

1.   Plaintiff SEPH's Motion for Summary Judgment (Doc. 63) is **GRANTED** as to

Defendants Sandy Creek II, LLC, Lester Boihem, Carroll Castille, the Rookery,

LLC, Paul Peed, and Raymond Peed;[12]

2.  Plaintiff SEPH's Motion for Summary Judgment (Doc. 63) is **DENIED** as to Defendants Nanni Pidikiti and Coast Investment Properties, LLC; and

3.  the Motions for Partial Summary Judgment (Docs. 86, 90, 93) filed by the Guarantor Defendants are **DENIED**.

**DONE** and **ORDERED** this the **21st** day of **June 2013**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[12] The Court will enter a final Judgment against these Defendants specifying the amount of damages after a determination is made concerning the issue of attorneys' fees and costs.  Attorneys' fees and costs will be considered after completion of the case.   Such consideration will be upon motion of the plaintiff, which includes supporting documentation for such request.