**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SE PROPERTY HOLDINGS, LLC, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 12-00303-KD-M |
| | ) | |
| SANDY CREEK II, LLC, *et al.*, | ) | |
|     Defendants. | ) | |

**ORDER**

This action is before the Court on the Motion for Summary Judgment against Defendant George W. Skipper, III ("Skipper") and supporting documents (Docs. 78-80) filed pursuant to Rule 56 of the Federal Rules of Civil Procedure by Plaintiff SE Property Holdings, LLC ("SEPH"), Skipper's Response and supporting documents in opposition (Doc. 101), and SEPH's Reply in support (Doc. 102).[1] Upon consideration, and for the reasons set forth herein, the Court finds that SEPH's motion for summary judgment against Skipper is due to be **GRANTED**.

### I. Procedural History

On May 3, 2012, SEPH initiated this action by filing a Complaint (Doc. 1) against Skipper and the other Defendants. The Complaint alleged breach of promissory notes by Defendant Sandy Creek II, LLC ("SC II") (identified as "Borrower" in the Complaint) (Count 1) and breach of guaranty agreements by all other Defendants (identified as "Guarantors" in the Complaint") (Count 2). SEPH also demanded that the Court order an accounting and inspection of certain financial transactions by the Defendants (Count 3).[2] Skipper filed his Answer on June 28, 2012. (Doc. 32).

---

[1] This case was previously stayed against Skipper due to his bankruptcy filing. (Doc. 51). However, SEPH has since obtained relief from the automatic stay to pursue this action against Skipper. (Doc. 77). In addition, the Court had previously referred all claims against Skipper in this action to his bankruptcy action for appropriate disposition. (Doc. 71). That reference has since been withdrawn. (Doc. 125).

[2] After a review of the record, the Court finds, as SEPH alleges (Doc. 1 at 3, ¶ 11), that it has subject matter jurisdiction over this action due to diversity pursuant to 28 U.S.C. § 1332.

On April 2, 2013, SEPH filed its Motion for Summary Judgment against Skipper. (Doc. 78), moving for summary judgment in its favor on its breach-of-guaranty claim against him.[3] Skipper filed his Response on May 1, 2013 (Doc. 101), and SEPH filed its Reply on May 9, 2013 (Doc. 102). The motion is now ripe for adjudication.[4]

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

(1) ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
  (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

---

[3] Technically, SEPH's motion "requests that the Court enter final summary judgment as to []Count One of its Complaint against the Defendant George W. Skipper, III." (Doc. 78). Count One asserts a claim only against SC II. However, SEPH's supporting brief and the various responses to the motion makes it clear that SEPH requests summary judgment on its breach-of-guaranty claim against Skipper in Count 2 of the Complaint.

[4] On January 10, 2013, SEPH filed a Motion for Summary Judgment against all Defendants except for Skipper (Doc. 63), moving for summary judgment in its favor on its breach-of-contract claims against those Defendants. Some of those Defendants also filed their own motions (Docs. 86-88, 90-93) moving for partial summary judgment in their favor on SEPH's claims against them. The Court has previously ruled on those motions. (Doc. 114).

**(4) *Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

### III. Facts

SEPH is the successor in merger for Vision Bank. (Doc. 79-1 at 1, ¶ 1 – Harmon Aff.; Doc. 98-1 (expressly incorporated in Reply, Doc. 102 at 5)). Vision Bank made two loans to SC II: 1) a $5 million loan to purchase real property ("property loan") (Doc. 101-33 - Skipper Ex. 33), which was executed on September 30, 2005, and matured on April 1, 2006, and 2) a $2

million loan to begin developing the property ("construction loan"), which was executed on October 13, 2006, and matured on April 1, 2007 (Docs. 101-11 & -12 – Skipper Exs. 10-11). (See also Doc. 101-2 – Braswell Depo.). In 2008, Vision Bank sold $4.5 million of the $5 million property loan to other banks pursuant to participation agreements. (Docs. 101-34 – -38; 101-2 at 11, 46, 59-60). Both loans were secured by mortgages on the real property (Doc. 101-2 at 34-35) and were executed with SC II as the borrower. (Docs. 101-11 & -33). The property loan named Skipper as a guarantor (Doc. 101-33 at 1-2, ¶ 3), with Skipper executing a Continuing Guaranty in September 2005 (hereinafter, the "2005 Unlimited Guaranty") (Doc. 79-2 at 6-10). The construction loan also named Skipper as a guarantor, with Skipper executing a Limited Continuing Guaranty in October 2006 (hereinafter, the "2006 Limited Guaranty"). (Id. at 11-15).

The 2005 Unlimited Guaranty provides, in relevant part, as follows:

1. **Guaranty.** For valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the undersigned, **GEORGE W. SKIPPER, III** (hereinafter called "Guarantor"), unconditionally guarantees and promises to pay to **VISION BANK**, a corporation (hereinafter called "Bank"), or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC**, an Alabama limited liability company (hereinafter called "Borrower"), to Bank. The word "Indebtedness" is used herein in its most comprehensive sense and pertains to a loan in the principal amount of Five Million Dollars ($5,000,000.00) being made by Bank to Borrower on or about the date hereof (the "Loan"). "Indebtedness" includes any and all advances, debts, obligations and liabilities of Borrower to Bank heretofore, now, or hereafter existing, made, incurred, or created, whether voluntary or involuntary, arising under, pursuant to or in connection with the Note (as hereinafter defined) and/or any and all other Loan Documents (as hereinafter defined), whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, not limited to but including principal, interest, costs of collection, attorney's fees and all other lawful charges . . . "Note" refers to the $5,000,000.00 principal amount Promissory Note dated on or about September 30, 2005, from Borrower to the Bank, as the same may from time to time be amended, restated, extended, consolidated, replaced and/or renewed, together with all such amendments, restatements, extensions, consolidations, replacements and/or renewals. "Loan Documents" (or singularly a "Loan Document") refers to the Note, the Mortgage and Security Agreement ("Mortgage") dated on or about the date hereof between Borrower and Bank and relating to the Loan, and all other documents and instruments related to the Loan

or any of the indebtedness and obligations at any time arising thereunder or the security therefor.

2. **Guaranty Continuing and Unlimited; Termination.** The liability of the Guarantor shall cover all Indebtedness, as that term is defined above, of Borrower to Bank and shall be unlimited. This is a continuing Guaranty relating to all Indebtedness, including but not necessarily limited to that Indebtedness arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied . . .

3. **Guarantor's Obligations Independent: Statute of Limitations.** The obligations of the Guarantor hereunder are independent of the obligations of Borrower and any other guarantor, and a separate action or actions may be brought and prosecuted against the Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions; and the Guarantor waives the benefit of any statute of limitations.

. . .

6. **Waivers.** Guarantor waives any right to require Bank to (a) proceed against Borrower or any other guarantor; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Bank's power whatsoever . . .

(Id. at 6-7).

The 2006 Limited Guaranty provides, in relevant part, as follows:

1. **GUARANTY.** For valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the-undersigned **GEORGE W. SKIPPER, III** (hereinafter called "Guarantor"), jointly and severally unconditionally guarantees and promises to pay to **VISION BANK** (hereinafter called "Bank"), or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC**, an Alabama limited liability company (hereinafter called "Borrower"), to Bank. The word "Indebtedness" is used herein in its most comprehensive sense and includes a loan to be made by Bank to Borrower within 10 days after the date hereof in the amount of up to Two Million Dollars ($2,000,000.00) (the "Loan") and any and all advances, debts, obligations and liabilities of Borrower to Bank heretofore, now, or hereafter existing, made, incurred, or created, whether voluntary or involuntary, and whether or not arising under, pursuant to or in connection with the Loan Agreement (as hereinafter defined) the Note (as hereinafter defined) and/or any and all other Loan Documents (as hereinafter defined), whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, not limited to but including principal, interest, costs of collection, attorney's fees and all other lawful charges . . . "Loan Agreement" refers to the Loan Agreement for Construction Financing to be dated on or about the date the Loan is first funded between Borrower and Bank, and "Note" refers to the Two Million Dollar

($2,000,000.00) maximum principal amount Promissory Note to be dated on or about the date of the Loan Agreement from the Borrower to the Bank, as the same may from time to time be amended, restated, extended, consolidated, replaced and/or renewed, together with all such amendments, restatements, extensions, consolidations, replacements and/or renewals. "Loan Documents" (or singularly a "Loan Document") refers to the Loan Agreement, the Note and all other documents and instruments related to the Note and/or any of the indebtedness and obligations at any time arising thereunder or the security therefor, and including, without limitation to the generality of the foregoing, a Mortgage and Security Agreement from Borrower to Bank dated on or about September 30, 2005, as modified by instruments between Borrower and Bank to be dated the date of the Note, as the said documents and instruments may from time to time be amended, restated, extended and/or consolidated.

2. **GUARANTY CONTINUING AND UNLIMITED.** The liability of the Guarantor shall be joint and several, shall cover all Indebtedness, as that term is defined above, of Borrower to Bank and, subject to the applicable limitations described in Section 14 below, shall be unlimited. This is a continuing Guaranty relating to all Indebtedness, including but not necessarily limited to that Indebtedness arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied . . .

3. **GUARANTOR'S OBLIGATIONS INDEPENDENT: STATUTE OF LIMITATIONS.** The obligations of the Guarantor hereunder are independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against the Guarantor whether action is brought against Borrower or any other Guarantor or whether Borrower or any other Guarantor be joined in any such action or actions; and the Guarantor waives the benefit of any statute of limitations or other defenses affecting its liability hereunder or the enforcement. . . .

6. **WAIVERS.** GUARANTOR WAIVES ANY RIGHT TO REQUIRE BANK TO (A) PROCEED AGAINST BORROWER OR ANY OTHER GUARANTOR; (B) PROCEED AGAINST OR EXHAUST ANY SECURITY HELD FROM BORROWER; OR (C) PURSUE ANY OTHER REMEDY IN BANK'S POWER WHATSOEVER . . .

14. **LIMITATIONS OF LIABILITY.** The limitations of liability under this Guaranty set forth in this Section 14 do not apply to the Borrower or to any other guarantor of Borrower's Indebtedness to the Bank. Guarantor shall be liable for, and the liability of Guarantor shall be limited to, (i) an amount equal to Guarantor's Specified Portion of the principal of the Note from time to time outstanding; (ii) 100% of all interest on the Loan accrued or accruing at any time, whether before or after acceleration or other maturity of the Note, prior to the payment-in-full by Guarantor of his or her liability under clauses (i), (ii), (iii) and (iv) of this sentence, (iii) 100% of all costs and expenses (including reasonable actual attorney's fees) of collection related or attributable, directly or indirectly, to

the enforcement of Guarantor's obligations under this Guaranty, and (iv) 100% of all other costs and expenses (including reasonable actual attorney's fees) of collection relating to all principal, interest and other charges under the Note and/or relating to any other Indebtedness and paid or incurred by the Bank prior to the payment-in-full by Guarantor of his or her liability under clauses (i), (ii) and (iii) of this sentence.

As used in this Section 14, the "Specified Portion" of Guarantor shall be as set forth below:

| GUARANTOR | SPECIFIED PORTION OF PRINCIPAL |
|---|---|
| George W. Skipper, III | Six Hundred Thousand Dollars ($600,000.00) |

. . .

15. **MISCELLANEOUS: JOINT AND SEVERAL LIABILITY.** Each Guarantor's liability hereunder shall be joint and several . . . No provision of this Guaranty shall be deemed in conflict with any other provision hereof, of the note or any other Loan Document, and the Guarantor acknowledges that no such provision or any interpretation thereof shall be deemed to diminish the rights of the Bank under the terms and conditions or any other provisions hereof or thereof.

. . .

(Id. at 11-15).

Vision Bank never communicated directly with Skipper, instead delegating the task of preparing and executing the guaranties to its attorneys. (Doc. 101-2 at 7-8, 80-83, 93 – Braswell Depo.). Vision Bank's attorneys sent the guaranties to Joe Raley Builders, developer of the Sandy Creek project; an employee of the company, Barbara Merryman ("Merryman"), was then instructed by Joe Raley ("Raley") to obtain signatures from Skipper and the other guarantors. (Doc. 101-4 at 2, 14 – Raley Depo.).

Both loans were renewed or modified multiple times over the years – the property loan in April 2006; both loans in April 2007, April/May 2008, and July 2008. Each renewal or modification was made without obtaining guarantor approval. During the 2008 loan renewals, Vision Bank was aware that sales for the Sandy Creek development were slow, that development

itself was not going as planned, and that the real estate market in general was falling. Vision Bank also obtained several appraisals of the collateral property – July 2005 ($9.84 million), August 2008 ($5.5 million), June 2009 ($4.25 million), September 2009 ($2,786,800) (obtained by participating bank), October 2011 ($1.07 million). (Doc. 101-2 – Braswell Depo; Docs. 101-46 – -51). Skipper claims he was never informed of these appraisals.

In July 2009, Skipper signed a "Supplement to Loan Documents" relating to the two loans, which stated in relevant part: "Borrower and all of the Included Guarantors acknowledge and agree that . . . the Loans and First Note and Second Note have matured and are in default and are due and payable in full . . ." (Doc. 79-2 at 1-4). That same month, SC II executed two Amended Promissory Notes in favor of Vision Bank (these are the notes on which SEPH bases its breach-of-contract claims): one for the principal amount of $3,521,057.89 ("amended property loan") (Doc. 79-1 at 5-7) and the other for the principal amount of $1,999,645.83 ("amended construction loan") (id. at 8-10). As with the original loans, Skipper was named as a guarantor for both amended loans. New guaranties were not executed for either of the Amended Promissory Notes.

The Amended Promissory Notes are in default, and all Defendants have refused SEPH's demand for payment. (Doc. 79-1 at 2, ¶¶ 6-7 – Harmon Aff.). SEPH claims that, as of January 9, 2013, the balance due under the amended property loan is $2,827,827.01 ($2,657,442.18 in principal and $170,384.83 in interest, with interest continuing to accrue "at a default rate of Wall Street Prime plus 4.5%, currently 8% ($590.54 per diem)" ), and that the balance due under the amended construction loan is $2,099,379.07 ($1,859,429.94 in principal and $239,949.13 in interest, with interest continuing to accrue "at a default rate of Wall Street Prime plus 4.5%, currently 8% ($413.21 per diem)"). SEPH claims that Skipper is liable for the full amount due on the amended property loan, under the terms of the relevant Amended Promissory note and the 2005 Unlimited Guaranty (id., ¶ 8), and that he is liable for $839,949.13 of principal and accrued interest pursuant to the terms of the 2006 Limited Guaranty (id. at 3, ¶ 9).

To date, SEPH has not foreclosed on the collateral real property.

## IV. Analysis

### a. Applicable Law

Before addressing the parties' substantive contentions, the Court must decide what law governs the claims in this diversity action. The claims in this action are based on contract law. "[A] federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." Manuel v. Convergys Corp., 430 F.3d 1132, 1139 (11th Cir. 2005) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). Alabama courts follow the traditional conflict-of-law principle of *lex loci contractus*. Lifestar Response of Ala., Inc. v. Admiral Ins. Co., 17 So. 3d 200, 213 (Ala. 2009). Accordingly, in Alabama, contract claims are governed by the laws of the state where the contract was made, unless the contracting parties chose a particular state's laws to govern their agreement. E.g., Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991). In this action, all loan documents at issue expressly provide that they are to be governed by the laws of Alabama, and no party has argued that the law of any other jurisdiction should apply. Therefore, the Court will apply Alabama law to the claims in this action.

### b. Arguments

In the Complaint, SEPH alleges that it "is the holder of the Notes and each Guaranty[,]" that Skipper is "in default under the Notes and Guaranties[,]" and that it has "demanded payment from" Skipper, who has "failed to pay." (Doc. 1 at 4-5, ¶¶ 15, 17, 19). Under Alabama law, " '[e]very suit on a guaranty agreement requires proof of the existence of the guaranty contract, default on the underlying contract by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty.' " Sharer v. Bend Millwork Sys., Inc., 600 So. 2d 223,

225-26 (Ala. 1992) (quoting <u>Delro Indus., Inc. v. Evans</u>, 514 So. 2d 976, 979 (Ala. 1987)).[5] " 'Rules governing the interpretation and construction of contracts are applicable in resolving a question as to the interpretation or construction of a guaranty contract.' " <u>Eagerton v. Vision Bank</u>, 99 So. 3d 299, 304 (Ala. 2012) (quoting <u>Gov't St. Lumber Co. v. AmSouth Bank</u>, 553 So. 2d 68, 75 (Ala. 1989)).

SEPH argues that it is due summary judgment in its favor on its breach-of-guaranty claims against Skipper based on the express, binding, and enforceable terms of the Amended Promissory Notes, the 2005 Unlimited Guaranty, and the 2006 Limited Guaranty, and because Skipper has "expressly acknowledged" that he is in default on the guaranties (Doc. 79 at 5, ¶ 5).

Upon consideration of the evidence presented, the Court finds that SEPH has met its initial burden of establishing that the loans are in default, in that Skipper "agrees that he signed or executed loan documents and that the notes associated with these loan documents are in default, but [he] cannot agree or dispute the amounts claimed by SEPH." (Doc. 101 at 9. <u>See also</u> Doc. 101-1 at 14-15 – Skipper Depo.).

---

[5] Moreover, "to recover under a . . . continuing guaranty, an additional element, notice to the guarantor of the debtor's default, must be proved." <u>Sharer</u>, 600 So. 2d at 226 (quotation omitted). However, "[t]he language of the guaranty is controlling in determining whether the holder of the guaranty is under a duty to notify the guarantor of a default by the principal, and notice need not be given when the terms of the guaranty expressly dispense with the need for it." <u>Id.</u> Paragraph 6 of both the 2005 Unlimited Guaranty and the 2006 Limited Guaranty provides, in relevant part: "Guarantor waives all presentments, demands for performance, **notices of non-performance**, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and of the existence, creation, or incurring of new or additional Indebtedness" (emphasis added). The Alabama Supreme Court has held that similar language in a continuing guaranty waived the requirement to provide notice of default. <u>See id.</u> ("The guaranty agreement Sharer executed provides in pertinent part: []'We waive, in connection with the indebtedness and with our obligation under this Guaranty, all presentments, demands for performance, *notices of non-performance,* protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty and of the existence, creation or incurring of any new or additional indebtedness.' [](Emphasis supplied.) . . . Because Sharer waived his right to notice of Sash and Door's nonperformance on the underlying contract, we hold that Bend and Pozzi were not required to prove that they gave Sharer such notice."). As such, because Skipper has waived the requirement, SEPH need not show it provided notice to Skipper of SC II's default on the notes in order to enforce the guaranties.

However, Skipper claims genuine issues of material fact as to whether he is discharged from his obligations under the guaranties due to material alterations made and caused by Vision Bank without his consent – specifically, by Vision Bank's several renewals of the loans without informing Skipper that the value of the collateral property had dropped. Skipper also claims genuine issues of material fact as to whether he is subject to the 2005 Unlimited Guaranty, arguing that, by its express language, the 2006 Limited Guaranty modified the 2005 Unlimited Guaranty such that Skipper's payment obligation on both loans is limited to that set forth in the limited guaranty ($600,000). Finally, Skipper argues that, even if he is liable to SEPH under the guaranties, 1) he is due a setoff on any amount owed because SEPH failed to act in a commercially reasonable manner by not foreclosing on the collateral real property, and 2) SEPH has not presented sufficient evidence to justify either its entitlement to collect on the guaranties.

### i. Material Alterations to Guaranties

Both loans at issue were secured by a mortgage on real property. According to Skipper's factual narrative, at the time the property loan was executed, the collateral real property was appraised at $9.84 million, thus making the $5 million property loan "double collateralized." Both loans were renewed several times over the years – in April 2006, late April/early May 2008, July 2008, August/September 2008, and July 2009 (when the Amended Promissory Notes on which SEPH relies in its Motion for Summary Judgment were executed). Each of these renewals, according to Skipper, was carried out without obtaining the consent of the guarantors and in spite of Vision Bank's knowledge that lot sales and development at the Sandy Creek project were slow and that the overall real-estate market was in decline. Moreover, Vision Bank obtained new appraisals of the collateral property prior to the August/September 2008 and July 2009 renewals showing that the value of the collateral had dropped, first to $5.5 million and then to $3.95 million. (Doc. 101 at 3-5, ¶¶ 5, 10).

Skipper has cited Eagerton v. Vision Bank, 99 So. 3d 299 (Ala. 2012), reh'g denied, (June

29, 2012), in support of his contention that material changes have rendered the guaranties unenforceable. In that case, the Alabama Supreme Court stated as follows with regard to guaranty contracts:

> The general rule is that "[a] guarantor is discharged if, without his or her consent, the contract of guaranty is materially altered." 38A C.J.S. *Guaranty* § 97, at 704 (2008). In Medley v. SouthTrust Bank of the Quad Cities, 500 So. 2d 1075 (Ala. 1986), this Court stated that any alteration beyond the terms of the guaranty contract, regardless of injury or benefit to the guarantor, is fatal:
>
> > "It is fundamental that the liability of a guarantor will not be extended by implication beyond the terms of his contract. *It matters not that he or she sustains no injury or even that it may be for his or her benefit.* This Court has said that the guarantor 'has a right to stand upon the very terms of his contract, and if he does not assent to any variation of it, and a variation is made, it is fatal.' Russell v. Garrett, 208 Ala. 92, 96–97, 93 So. 711 (1922), quoting Manatee County State Bank v. Weatherly, 144 Ala. 655, 39 So. 988 (1905). See, also, Furst v. Shows, 215 Ala. 133, 110 So. 299 (1926)."
>
> 500 So. 2d at 1081 (emphasis added). In other words, the general rule regarding guaranties is so strict that courts will not stop to inquire whether any alteration was injurious or beneficial to the guarantor.

Eagerton, 99 So. 3d at 305-06.

Skipper contends there is a genuine issue of material fact as to whether the several loan renewals by Vision Bank "constituted material changes to the loan agreements and guaranties because of the drastic drop in the value of the collateral securing the Sandy Creek loan." Should these renewals constitute material changes, the guaranties would be unenforceable "[b]ecause Vision Bank did not obtain consent agreements from [Skipper] affirming the guaranties . . . " (Doc. 101 at 13).

SEPH argues that Eagerton is distinguishable from the present case and that the terms of the guaranties in this case make any drop in the value of the loan collateral irrelevant to their enforceability. The Court agrees. Eagerton also involved guaranties related to two loans, "the original loan" and "the second loan." Whereas other guarantors had executed "unlimited"

guaranties with regard to the two loans, "[o]n each of their guaranty contracts, [Appellants ]the Eagertons . . . limited their liability to 'indebtedness' arising out of . . . the original loan, as well as any 'extensions, renewals or replacements thereof.' " 99 So. 3d at 305. With the participation of the lender, but not the Eagertons, the original loan was later consolidated with the second loan in a Chapter 11 bankruptcy proceeding, and the lender sought payment from the Eagertons on the consolidated loan pursuant to their guaranty contracts. Id. at 302-03. The Alabama Supreme Court, however, agreed with the Eagertons' argument that "the consolidation of the original loan with the second loan[] created a new 'indebtedness' and/or contract not encompassed by their guaranty contracts" and "that the creation of this new indebtedness, without their knowledge or consent, operated to discharge them from any further obligations under their guaranty contracts." Id. at 306. Specifically, the court found that the bankruptcy loan consolidation constituted a "modification," rather than an "extension[], renewal[] or replacement[,]" of the original loan. As the Eagertons "did not guarantee . . . the original loan[] 'with modifications[,]' . . . once the original loan was modified pursuant to [the] Chapter 11 reorganization, the Eagertons were discharged from any further obligations under their guaranty contracts securing the original loan." Id. at 307.

In this case, no "new indebtedness" was created by the repeated renewal of the loans. The decline in value of the collateral property had no effect on the indebtedness owed by Skipper. As the express terms of the guaranties provide, SEPH is under no obligation to use the collateral property to satisfy the loans before seeking payment from the guarantors. Both the 2005 Unlimited Guaranty and 2006 Limited Guaranty state: "It is the intent hereof that the obligations of the Guarantor hereunder shall be and remain unaffected (a) by the existence or non-existence, validity or invalidity of any pledge, assignment or conveyance given as security . .

.'" (Doc. 79-2 at 7, ¶ 4, 12, ¶ 4). Moreover, in executing the guaranties, Skipper expressly 1) "authorize[d] [Vision ]Bank, without notice or demand and without affecting his liability hereunder, from time to time to . . . (b) take and hold security for the payment of the Guaranty or the Indebtedness guaranteed, and exchange, modify, enforce, waive and release any such security . . ." (id. at 7, ¶ 5, 12, ¶ 5 (emphasis added)), and 2) "waive[d] any right to require Bank to . . . (b) proceed against or exhaust any security held from Borrower . . ." (id. at 7, ¶ 6, 12, ¶ 6).

Under these terms, regardless of whether the collateral property increases or decreases in value, SEPH is entitled to forego foreclosure on the collateral and instead seek full payment on the loans from Skipper. As such, "the liability of [the] guarantor[s] [has] not be[en] extended by implication beyond the terms of [their] contracts" by the changing value of the collateral property. Eagerton, 99 So. 3d at 306 (quotation omitted). See also John Glenn *et al.*, 38A C.J.S. Guaranty § 97 (2013) ("Whether an alteration in a guaranty contract is material depends upon whether after the alteration it expresses the same contract, and whether it will have the same operation and effect. If the alteration in a guaranty changes the guarantor's liability it is material. . . . It has been said that an alteration of a guaranty agreement is not 'material,' as basis for discharging the guarantor, unless the guarantor is placed in the position of being required to do more than his or her original undertaking." (footnotes omitted)). Therefore, Skipper has failed to demonstrate material alterations to the guaranties.

### ii. 2006 Limited Guaranty Modifies 2005 Unlimited Guaranty

Even if the guaranties are enforceable, Skipper argues that he is liable only for the amount provided for in the 2006 Limited Guaranty, which by its "plain language . . . supercedes" the 2005 Unlimited Guaranty "by limiting the obligations of Skipper on both loans to a specified principal amount." (Doc. 101 at 14).

In Alabama, "[p]arties may modify the terms of their agreement and 'if the terms of a

subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail.'" McLemore v. Hyundai Motor Mfg. Ala., LLC, 7 So. 3d 318, 332-33 (Ala. 2008) (quoting Cavalier Mfg., Inc. v. Clarke, 862 So. 2d 634, 641 (Ala. 2003) (plurality opinion)). See also RRE Crestwood Holding, LLC v. CV Apartments, LLC, No. 2:11-CV-01466-AKK, 2012 WL 3139588, at *4 (N.D. Ala. July 26, 2012) ("[W]hen 'two agreements cover *the same subject matter* and include inconsistent terms, the later agreement supersedes the earlier agreement.' " (quoting Cavalier Mfg., 862 So. 2d at 641) (plurality opinion) (emphasis added) (quoting for proposition CMI Int'l, Inc. v. Intermet Int'l Corp., 251 Mich. App. 125, 130, 649 N.W.2d 808, 812 (2002))). "Both parties must mutually assent to a modification." Ex parte Amoco Fabrics & Fiber Co., 729 So. 2d 336, 340 (Ala. 1998). See also Whorton v. Bruce, 17 So. 3d 661, 665 (Ala. Civ. App. 2009) (" '[I]t is an elementary principle of contract law that in order for a contract to be validly modified, there must be mutual assent to the new terms by both parties. ... It is incumbent on the party claiming the modification to show that the new agreement was mutually agreed to.' " (quoting Wiregrass Constr. Co. v. Tallapoosa River Elec. Coop., Inc., 365 So. 2d 95, 98 (Ala. Civ. App. 1978))). Though Skipper spends significant page space arguing ambiguity in support of his contention that the 2006 Limited Guaranty supersedes the 2005 Unlimited Guaranty, " '[i]t is a general rule that a party claiming that a contract modifies a prior contract must show that the later contract is definite and certain as to the terms of modification, and the modification extends only so far as the terms are definite, certain and intentional.' " McLemore, 7 So. 3d at 333 (quoting Johnson-Rast & Hays, Inc. v. Cole, 310 So. 2d 885, 889 (Ala. 1975) (citing 17 C.J.S. Contracts § 347, p. 424)).

In both the 2005 Unlimited Guaranty and the 2006 Limited Guaranty, Skipper "unconditionally guarantees and promises to pay to **VISION BANK** . . . or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC** . . . to Bank." As Skipper points out, "Indebtedness" as defined in the 2006 Limited Guaranty is very broad and can be read to encompass the property loan as well as the

construction loan, especially when compared with the more confined definition of "Indebtedness" contained in the 2005 Unlimited Guaranty.

"Indebtedness" in the 2005 Unlimited Guaranty specifically "pertain[s] to" the $5 million property loan and "includes any and all advances, debts, obligations and liabilities of [SC II] to [Vision ]Bank heretofore, now, or hereafter existing, made, incurred, or created, . . . arising under, pursuant to or in connection with" the $5 million property loan. In contrast, "Indebtedness" in the 2006 Limited Guaranty "includes" the construction loan as well as "any and all advances, debts, obligations and liabilities of [SC II] to [Vision ]Bank **heretofore**, now, or hereafter **existing**, made, incurred, or created, . . . **whether or not** arising under, pursuant to or in connection with" the construction loan. The 2005 property loan can be considered an "advance[], debt[], obligation[] [or] liability[y] of [SC II] to [Vision ]Bank heretofore . . . made, incurred, or created, . . . not arising under, pursuant to or in connection with" the construction loan. As such, the 2006 Limited Guaranty could be read to modify the terms of the 2005 Unlimited Guaranty by limiting Skipper's liability for "any and all Indebtedness" of SC II to Vision Bank "heretofore . . . or hereafter existing, made, incurred, or created," including the original property loan and the amended property loan.

SEPH "assum[es] *arguendo* that the language in the 2006 limited guaranty [is] broad enough to overlap with the underlying debt covered by the 2005 guaranty" but argues that "[t]here is nothing in the 2006 guaranty that purports to revoke or supplant the 2005 unlimited guaranty of" the property loan. In support, SEPH cites Ferguson v. Cadle Co., 816 So. 2d 473, 476 (Ala. 2001), in which it claims "the Supreme Court of Alabama has expressly held that a later 'guaranty cannot, in and of itself, negate the earlier guaranty.' " That holding, however, does not have the broad application SEPH argues; it is instead limited to the specific facts of that case, where the earlier guaranty contained express language stating that "the only way to revoke

that guaranty [wa]s by written notice actually received by the Bank." <u>Ferguson</u>, 816 So. 2d at 476 (quotation marks omitted). Because the record in <u>Ferguson</u> contained no evidence of such a condition being met, the court found that the later guaranty did not revoke or replace the earlier one. This result is consistent with the Alabama Supreme Court's holding that "a provision in a continuing guaranty agreement that requires a particular method of revocation must be given effect as written . . ." <u>Barnett Millworks, Inc. v. Guthrie</u>, 974 So. 2d 952, 957 (Ala. 2007). SEPH does not point to any such provision in any of the guaranties at issue. The other cases to which SEPH cites in support of this contention are not relevant, as they do not address contract modification under Alabama law. <u>See</u> <u>Alton Banking & Trust Co. v. Schweitzer</u>, 121 Ill. App. 3d 629, 634 (1984) (rejecting theories of merger and novation under Illinois law in finding that a later guaranty did not replace a previous one); <u>RRE Crestwood</u>, 2012 WL 3139588, at *4 (finding that Alabama merger doctrine did not apply to three guaranties because each related to a different obligation).

However, "[t]erms of a written instrument should be construed *in pari materia* and a construction adopted that gives effect to all terms used." <u>Sullivan, Long & Hagerty v. S. Elec. Generating Co.</u>, 667 So. 2d 722, 725 (Ala. 1995). A review of the document indicates that the express terms of the 2006 Limited Guaranty do not allow for modification of Skipper's liability in the 2005 Unlimited Guaranty. Specifically, paragraph 15 of the 2006 Limited Guaranty provides: "No provision of this Guaranty shall be deemed in conflict with … **any other Loan Document**, and the Guarantor acknowledges that no such provision or any interpretation thereof shall be deemed to diminish the rights of the Bank under the terms and conditions of any other provisions … **thereof**." (Doc. 79-2 at 14-15 (emphasis added)). The term "Loan Documents," as set out in paragraph 1 of the 2006 Limited Guaranty, refers to, *inter alia*, "**all other**

**documents and instruments related to** the Note and/or any of the indebtedness and obligations at any time arising thereunder or the security therefor, and **including**, without limitation to the generality of the foregoing, **a Mortgage and Security Agreement from Borrower to Bank dated on or about September 30, 2005**, as modified by instrument between Borrower and Bank to be dated the date of the Note, as the said documents and instruments may from time to time be amended, restated, extended and/or consolidated." (Id. at 11 (emphasis added)).

The Amended Promissory Note for the 2005 property loan states that its indebtedness is secured by a "certain Mortgage and Security Agreement . . . dated on or about September 30, 2005, from Borrower to Bank . . ." (Doc. 79-1 at 5-6, ¶ 3). It also states that it "has been guarantied by [Skipper and others] pursuant to separate continuing guaranties heretofore executed by said Guarantors . . ." (Id. at 5, ¶ 3). As such, the 2005 Unlimited Guaranty can plainly be considered a "document[] or instrument[] related to . . . [the] Mortgage and Security Agreement from Borrower to Bank dated on or about September 30, 2005," *supra*, and is therefore a "Loan Document" under the 2006 Limited Guaranty. Because the provisions of any such "Loan Document" cannot be "deemed in conflict with" the provisions of the 2006 Limited Guaranty, nor can the provisions of the 2006 Limited Guaranty be read to "diminish the rights of" SEPH under any "Loan Document," *supra*, the terms of the 2006 Limited Guaranty do not "contradict," and therefore do not modify or supercede, the terms of the 2005 Unlimited Guaranty, see McLemore, 7 So. 3d at 332-33.

### iii. Commercially Unreasonable Behavior

Skipper also argues that SEPH is not entitled to recover the full amount due on the loans because it (and Vision Bank) acted in a commercially unreasonable manner by failing to foreclose on the collateral property, even though it was aware that the property's value was declining. Alabama law states: "Every aspect of a disposition of collateral, including the

method, manner, time, place, and other terms, must be commercially reasonable." Ala. Code § 7-9A-610(b). However, "a secured party's failure to have conducted a sale or disposition of collateral in a commercially reasonable manner does not absolutely bar the secured party from recovering the deficiency between the amount due on the secured debt and the proceeds of the sale or disposition of the collateral. Rather, the debtor is entitled to set off any loss proven at trial against the deficiency owed to a secured party." Folks v. Tuscaloosa Cnty. Credit Union, 989 So. 2d 531, 535 (Ala. Civ. App. 2007) (citing Stone v. Cloverleaf Lincoln-Mercury, Inc., 546 So. 2d 388, 390 (Ala. 1989)). See also Abston v. Cent. Bank of the S., 492 So. 2d 1298, 1300 (Ala. 1986) ("[A] debtor may be entitled to a reduction in the amount of a deficiency remaining after the sale of collateral as damages for a creditor's commercially unreasonable behavior in the sale of repossessed collateral." (citing Valley Mining Corp., Inc. v. Metro Bank, 383 So. 2d 158 (Ala. 1980)).

Skipper has cited no Alabama case law applying this concept either to real property collateral or to behavior occurring outside the actual "sale or disposition of collateral," and the Court's own research has uncovered none. As has been discussed *supra*, Skipper expressly waived any requirement of SEPH to foreclose on the collateral property. Moreover,

> compelling a lender to foreclose on collateral instead of suing to recover unpaid debts (in the absence of any contract provision imposing such a condition precedent) would stretch the concept of mitigation beyond all reasonable boundaries. See, e.g., SE Property Holdings, LLC v. Foley, 2012 WL 1382523, *4 (S.D. Ala. Apr. 20, 2012) (rejecting argument that lender had a duty to mitigate damages by foreclosing on property rather than allowing interest to accrue at default rate); REL Development, Inc. v. Branch Banking & Trust Co., 699 S.E.2d 779, 781–82 (Ga. App. 2010) (where contract provisions give lender the right to choose between foreclosure and filing suit, "the bank was under no duty to appellant to proceed against the collateral to collect payment," such that "the bank had no obligation to mitigate its damages in relation to the collateral"); Fifth Third Bank v. Canvasser, 2011 WL 2347707, *2 (Mich. App. June 14, 2011) (finding no merit to defendants' contention that plaintiff lender breached duty to mitigate by suing instead of foreclosing on collateral, reasoning that

"plaintiff suffered damages as soon as the promissory notes were defaulted on; foreclosure is merely one possible remedy, and under the contracts, plaintiff had its choice of remedies. Electing one rather than another does not *per se* constitute a failure to mitigate."). Besides, **Alabama courts have expressly declined to impose any such mandatory duty of foreclosure in the mortgage context.** See Triple J Cattle, Inc. v. Chambers, 551 So. 2d 280, 282 (Ala. 1989) ("Upon a default by the mortgagor, the mortgagee has three remedies, and he may pursue any one or all of them until the debt is satisfied.... He is not required to foreclose the mortgage first, but may bring his action on the note alone.").

Whitney Bank v. Point Clear Dev., LLC, Civ. A. No. 11-0657-WS-M, 2012 WL 2277597, at *5 (S.D. Ala. June 18, 2012) (Steele, C.J.) (emphasis added).

As such, Skipper's argument that he is due a set off for commercially unreasonable behavior is without merit.

### iv. Entitlement to Collect on the Loans

Skipper argues that SEPH "fail[s] to present sufficient undisputed facts in support of [its] claims - - particularly in regards to damages and whether SEPH has the contractual authority or standing to pursue the breach of contract claims." (Doc. 101 at 20-21). First, he points to testimony of Alexander Braswell, SEPH's corporate representative under Rule 30(b)(6) of the Federal Rules of Civil Procedure, stating that Vision Bank sold $4.5 million of the $5 million property loan to participating banks, retaining $500,000 (10%) of the original principal. Pursuant to this testimony, Skipper argues that "SEPH has presented no evidence to the Court as to its legal entitlement to recover damages on the debt which SEPH (or its purported predecessor in interest, Vision Bank) has actually recovered long ago from the sale thereof to participating banks[,]" claiming that the 2005 Unlimited Guaranty is "wholly silent as to the existence of participating banks and the rights of Vision Bank (or SEPH) to recover principal sold to participating banks from guarantors." (Id. at 21). In response, SEPH asserts:

As between SEPH and Skipper, the parties in privity to the contracts at issue, the guaranty agreements expressly define the amounts that Skipper owes to SEPH. Any agreements that SEPH may have made with participant banks for the sale of portions of the underlying debt are not at issue in this case, nor is any contractual obligation that SEPH may have with the participant banks concerning repayment of the loan proceeds. Issues relating to the division of proceeds between SEPH

and the participant banks are irrelevant to SEPH's motion for summary judgment as to the breach of contract by Skipper.

(Doc. 102 at 8).

Notwithstanding these assertions, the loan participation agreements for the property loan each provide: "Originating Bank [Vision Bank] shall, subject to the provisions of this Agreement, retain all rights with respect to enforcement, collection, and administration of the Loan and the security underlying the Loan therefore, in accordance with the terms of this Agreement." (Docs. 101-34 – 101-38, ¶ 16.c.). Skipper has not identified any language in the participation agreements that would otherwise limit SEPH's right to claim the full amount owed on the property loan.

Skipper also argues that SEPH has failed to show that it has been assigned or otherwise "stepped into the shoes" of Vision Bank in relation to the guaranties or that it is otherwise the successor in interest to those rights. However, SEPH has presented 1) the affidavit of Karen Harmon, assistant secretary of SEPH, who states that SEPH is the "successor in merger for Vision Bank" (Doc. 79-1 at 1, ¶ 1), and 2) a certified copy of the "Certification of Merger and Transfer" between Vision Bank and SEPH (Doc. 98-1). Skipper merely faults Harmon's affidavit statement for being "conclusory," and he has not moved to strike or otherwise challenge the Certification of Merger and Transfer. The Court finds that either of these pieces of evidence is sufficient to prove the point asserted – that SEPH is the successor in merger of Vision Bank and that Skipper has presented insufficient evidence to create an issue of fact. Under Alabama law, "all rights, immunities, and franchises of the merged entities, of a public as well as a private nature; and all debts and obligations due the merged entities, are taken and deemed to be transferred and vested in the surviving or resulting entity without the necessity of any deed or other instrument of conveyance to the surviving or resulting entity . . ." Ala. Code § 10A-1-8.02(i)(2). Thus, the Court finds there is no genuine issue of material fact as to SEPH's entitlement to enforce the loans made by Vision Bank in this case.

## V.    Conclusion

In accordance with the foregoing analysis, it is **ORDERED** that Plaintiff SEPH's Motion for Summary Judgment against Defendant George W. Skipper, III (Doc. 78) is **GRANTED**.[6]

**DONE** and **ORDERED** this the **23rd** day of **August 2013**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[6] The Court will enter a final Judgment specifying the amount of damages after a determination is made concerning the issue of attorneys' fees and costs.  Attorneys' fees and costs will be considered after completion of the case. Such consideration will be upon motion of Plaintiff SEPH, which shall include supporting documentation for such request.