# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| SE PROPERTY HOLDINGS, LLC,     ) | |
|     Plaintiff,     ) | |
|                                       ) | |
| v.     ) | CIVIL ACTION NO. 12-00303-KD-M |
|                                       ) | |
| SANDY CREEK II, LLC, *et al.*,     ) | |
|     Defendants.     ) | |

## ORDER

This action came before the Court for a non-jury trial on October 23, 2013, at which the claims alleged by Plaintiff SE Property Holdings, LLC ("SEPH") against Defendants Nanni Pidikiti ("Dr. Pidikiti") and Coast Investment Properties, LLC ("CIP") were tried.[1] Upon consideration of the arguments and evidence presented at trial, the parties' post-trial briefs (Docs. 140-141), and all other pertinent portions of the record, the Court makes the following findings of fact and conclusions of law:

### I. Procedural History

On May 3, 2012, SEPH initiated this action by filing a Complaint (Doc. 1) against Dr. Pidikiti, CIP, and others. SEPH alleged causes of action relating to two loans it made to Defendant Sandy Creek II and the promissory notes and guaranties executed pursuant to those loans. Count 2 of the Complaint alleged a claim for breach of guaranty agreements by Dr. Pidikiti and CIP (identified as "Guarantors" in the Complaint). SEPH also demanded that the Court order an accounting and inspection of certain financial transactions by the Defendants

---

[1] SEPH was granted summary judgment as to its claims against all other Defendants (Docs. 114, 127). This action was subsequently dismissed with prejudice as to Defendants Lester Boihem, Carroll Castille, Paul Peed, Raymond Peed, and the Rookery, LLC, pursuant to SEPH's notice of settlement with these Defendants. (Docs. 116, 133). The issue of attorneys' fees and costs remains to be determined as to Defendants Sandy Creek II, LLC and George W. Skipper, III.

(Count 3).[2][3] Dr. Pidikiti and CIP filed their Answer on June 29, 2012. (Doc. 35).

SEPH, Dr. Pidikiti, and CIP each moved for summary judgment as to SEPH's claims in Count 2 (Docs. 63, 93), which the Court denied (Doc. 114).[4] This action then proceeded to a non-jury trial.

## II. Findings of Fact

Dr. Pidikiti is a cardiologist who has been practicing in Mississippi since 1993. She handles a number of the business aspects of her practice, including investment decisions and the hiring and firing of employees. In the summer of 2005, Dr. Pidikiti was contacted by a real estate agent from Baldwin County, Alabama, who is the sister of a nurse at Dr. Pidikiti's practice. The agent discussed Dr. Pidikiti's potential involvement in certain real estate ventures in the Baldwin County area, and Dr. Pidikiti expressed an interest. Dr. Pidikiti took a day trip to Baldwin County, where she was introduced to Scott Raley ("Raley") and Barbara Merryman ("Merryman") and spent the day with them driving around looking at development projects. One of the projects Raley mentioned was the Sandy Creek development ("Sandy Creek").

Raley later called Dr. Pidikiti to tell her more about Sandy Creek, the opportunity for her to invest in it, and about the other investors involved. Dr. Pidikiti eventually decided to invest in Sandy Creek.[5] She formed the limited liability company CIP to hold her interest in Sandy Creek.

---

[2] SEPH has pled sufficient facts demonstrating that the Court has subject-matter jurisdiction over this action as a result of diversity pursuant to 28 U.S.C. § 1332. (Doc. 1 at 3, ¶ 11). No party has challenged subject-matter jurisdiction, and nothing in the record contradicts SEPH's allegations supporting jurisdiction.

[3] As the parties did not include any mention of SEPH's Count 3 claims for accounting and inspection in their Joint Pretrial Document (Doc. 129), which the Court adopted in its final pretrial order (Doc. 132), the Court considers those claims abandoned. See Delta Health Grp. Inc. v. Royal Surplus Lines Ins. Co., 327 F. App'x 860, 867 (11th Cir. 2009) ("The pretrial order supersedes the pleadings." (citing Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1012 (11th Cir. 1982)).

[4] The Court ordered stricken Pidikiti and CIP's motion for summary judgment as untimely filed, except to the extent that arguments timely filed by the other Guarantor Defendants [were] applicable to Pidikiti and CIP." (Doc. 114 at 3).

[5] At trial, Dr. Pidikiti testified that she had made other investments before Sandy Creek but never before

2

In conjunction with the Sandy Creek project, Raley organized Sandy Creek II, LLC ("SC II"), of which CIP and other investors were members. (Pl. Ex. 1, Articles of Organization). For an initial equity investment of $500,000.00, CIP held a 20% interest in SC II. (Pl. Ex. 5, SC II Operating Agreement).

On September 30, 2005, having obtained the unanimous consent of its members to do so (Pl. Ex. 26), SC II obtained a $5 million loan ("the property loan") from Vision Bank ("Vision")[6] by executing a promissory note in favor of Vision (Pl. Ex. 19) secured by a mortgage (Pl. Ex. 20) on the Sandy Creek property. The property loan was set to mature on November 1, 2005, and named both Pidikiti and CIP as guarantors. (Pl. Ex. 19). SEPH later sold interest in all but $500,000 of the property loan principal to other banks pursuant to participation agreements.

On October 13, 2006, again having obtained the unanimous consent of its members to do so (Pl. Ex. 45), SC II obtained a $2 million loan ("the construction loan") from Vision (Pl. Ex. 43, Loan Agreement for Construction Financing) by executing a second promissory note in favor of Vision (Pl. Ex. 44). The construction loan was originally set to mature on April 1, 2007. (Id.). The original mortgage was modified that same day to secure the construction loan as well as the property loan. (Pl. Ex. 36).

At the times they were executed, Dr. Pidikiti was aware that CIP and/or she personally would be required to guarantee the loans. Dr. Pidikiti had previously guaranteed other debt and is generally aware of what it means to do so. Dr. Pidikiti and CIP,[7] along with other investors, executed Continuing Guaranties for the property loan in September 2005 ("the 2005 unlimited guaranties") (Pl. Ex. 11 & 12). Dr. Pidikiti, along with other investors, executed a Limited Continuing Guaranty for the construction loan in October 2006 ("the 2006 limited guaranty") (Pl. Ex. 39A). Dr. Pidikiti did not deal directly with Vision in executing the guaranties. Instead,

---

in real estate.

[6] SEPH is the successor in merger for Vision. (Pl. Ex. 81, Certificate of Merger and Transfer).

[7] Pidikiti signed all documents for CIP in her capacity as its managing member.

3

Vision's attorneys sent the unsigned guaranties to Raley and Merryman, who then forwarded them to the guarantors for execution.

The 2005 unlimited guaranties SEPH seeks to enforce provide, in relevant part, as follows:

> 1. **Guaranty.** For valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the undersigned, [Nanni Pidikiti/Coast Investment Properties, LLC] (hereinafter called "Guarantor"), unconditionally guarantees and promises to pay to **VISION BANK**, a corporation (hereinafter called "Bank"), or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC**, an Alabama limited liability company (hereinafter called "Borrower"), to Bank. The word "Indebtedness" is used herein in its most comprehensive sense and pertains to a loan in the principal amount of Five Million Dollars ($5,000,000.00) being made by Bank to Borrower on or about the date hereof (the "Loan"). "Indebtedness" includes any and all advances, debts, obligations and liabilities of Borrower to Bank heretofore, now, or hereafter existing, made, incurred, or created, whether voluntary or involuntary, arising under, pursuant to or in connection with the Note (as hereinafter defined) and/or any and all other Loan Documents (as hereinafter defined), whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, not limited to but including principal, interest, costs of collection, attorney's fees and all other lawful charges . . . "Note" refers to the $5,000,000.00 principal amount Promissory Note dated on or about September 30, 2005, from Borrower to the Bank, as the same may from time to time be amended, restated, extended, consolidated, replaced and/or renewed, together with all such amendments, restatements, extensions, consolidations, replacements and/or renewals. "Loan Documents" (or singularly a "Loan Document") refers to the Note, the Mortgage and Security Agreement ("Mortgage") dated on or about the date hereof between Borrower and Bank and relating to the Loan, and all other documents and instruments related to the Loan or any of the indebtedness and obligations at any time arising thereunder or the security therefor.
>
> 2. **Guaranty Continuing and Unlimited; Termination.** The liability of the Guarantor shall cover all Indebtedness, as that term is defined above, of Borrower to Bank and shall be unlimited. This is a continuing Guaranty relating to all Indebtedness, including but not necessarily limited to that Indebtedness arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied . . .
>
> . . .
>
> 14. **Miscellaneous: Joint and Several Liability.** . . . Guarantor's liability hereunder shall be joint and several wit Borrower and any other guarantor.

4

. . .

(Pl. Ex. 11 & 12). Dr. Pidikiti verified her signature on both 2005 unlimited guaranties. However, she testified that the 2005 unlimited guaranties relating to the property loan presented by SEPH are not the ones she signed. According to Dr. Pidikiti, she rejected guaranties imposing unlimited liability on her and CIP for the property loan, insisting to Raley and Merryman that any liability as to the property loan be limited to $1 million. Merryman then sent her new guaranties containing language that limited Dr. Pidikiti and CIP's liability to either "$1 million" or "20%" of any loan indebtedness. Dr. Pidikiti testified that the new guaranties also said "limited guaranty" on the first page of each. Satisfied with these limited guaranties, Dr. Pidikiti executed them on behalf of herself and CIP and returned the hard copies to Raley and Merryman via overnight mail. Dr. Pidikiti testified that despite diligently searching through her records she has been unable to locate copies of either of these claimed limited guaranties.

The 2006 limited guaranty relating to the construction loan provides, in relevant part, as follows:

> 1. **GUARANTY.** For valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the-undersigned **NANNI PIDIKITI** (hereinafter called "Guarantor"), jointly and severally unconditionally guarantees and promises to pay to **VISION BANK** (hereinafter called "Bank"), or order, on demand, in lawful money of the United States, any and all Indebtedness, as hereinafter defined, of **SANDY CREEK II, LLC**, an Alabama limited liability company (hereinafter called "Borrower"), to Bank. The word "Indebtedness" is used herein in its most comprehensive sense and includes a loan to be made by Bank to Borrower within 10 days after the date hereof in the amount of up to Two Million Dollars ($2,000,000.00) (the "Loan") and any and all advances, debts, obligations and liabilities of Borrower to Bank heretofore, now, or hereafter existing, made, incurred, or created, whether voluntary or involuntary, and whether or not arising under, pursuant to or in connection with the Loan Agreement (as hereinafter defined) the Note (as hereinafter defined) and/or any and all other Loan Documents (as hereinafter defined), whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, not limited to but including principal, interest, costs of collection, attorney's fees and all other

lawful charges . . . "Loan Agreement" refers to the Loan Agreement for Construction Financing to be dated on or about the date the Loan is first funded between Borrower and Bank, and "Note" refers to the Two Million Dollar ($2,000,000.00) maximum principal amount Promissory Note to be dated on or about the date of the Loan Agreement from the Borrower to the Bank, as the same may from time to time be amended, restated, extended, consolidated, replaced and/or renewed, together with all such amendments, restatements, extensions, consolidations, replacements and/or renewals. "Loan Documents" (or singularly a "Loan Document") refers to the Loan Agreement, the Note and all other documents and instruments related to the Note and/or any of the indebtedness and obligations at any time arising thereunder or the security therefor, and including, without limitation to the generality of the foregoing, a Mortgage and Security Agreement from Borrower to Bank dated on or about September 30, 2005, as modified by instruments between Borrower and Bank to be dated the date of the Note, as the said documents and instruments may from time to time be amended, restated, extended and/or consolidated.

2. **GUARANTY CONTINUING AND UNLIMITED.** The liability of the Guarantor shall be joint and several, shall cover all Indebtedness, as that term is defined above, of Borrower to Bank and, subject to the applicable limitations described in Section 14 below, shall be unlimited. This is a continuing Guaranty relating to all Indebtedness, including but not necessarily limited to that Indebtedness arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied . . .

. . .

14. **LIMITATIONS OF LIABILITY.** The limitations of liability under this Guaranty set forth in this Section 14 do not apply to the Borrower or to any other guarantor of Borrower's Indebtedness to the Bank. Guarantor shall be liable for, and the liability of Guarantor shall be limited to, (i) an amount equal to Guarantor's Specified Portion of the principal of the Note from time to time outstanding; (ii) 100% of all interest on the Loan accrued or accruing at any time, whether before or after acceleration or other maturity of the Note, prior to the payment-in-full by Guarantor of his or her liability under clauses (i), (ii), (iii) and (iv) of this sentence, (iii) 100% of all costs and expenses (including reasonable actual attorney's fees) of collection related or attributable, directly or indirectly, to the enforcement of Guarantor's obligations under this Guaranty, and (iv) 100% of all other costs and expenses (including reasonable actual attorney's fees) of collection relating to all principal, interest and other charges under the Note and/or relating to any other Indebtedness and paid or incurred by the Bank prior to the payment-in-full by Guarantor of his or her liability under clauses (i), (ii) and (iii) of this sentence.

As used in this Section 14, the "Specified Portion" of Guarantor shall be as set forth below:

| GUARANTOR | SPECIFIED PORTION OF PRINCIPAL |
|---|---|
| NANNI PIDIKITI | Six Hundred Thousand Dollars ($600,000.00) |

. . .

15. **MISCELLANEOUS: JOINT AND SEVERAL LIABILITY.** Each Guarantor's liability hereunder shall be joint and several . . . No provision of this Guaranty shall be deemed in conflict with any other provision hereof, of the note or any other Loan Document, and the Guarantor acknowledges that no such provision or any interpretation thereof shall be deemed to diminish the rights of the Bank under the terms and conditions or any other provisions hereof or thereof.

. . .

(Pl. Ex. 39A). Dr. Pidikiti testified that she received the entire 2006 limited guaranty via fax from Raley's office, read it, and then signed and faxed the signature page back to Merryman.[8]

The promissory notes for both loans were renewed and modified several times by SC II. (Pl. Ex. 48A-F & 49A-E). The operative promissory notes SEPH seeks to enforce in this action are Amended Promissory Notes for both loans executed in July 2009. (Pl. Ex. 48F & 49E). Dr. Pidikiti also signed a document titled "Supplement to Loan Documents" in July 2009 that extended the maturity dates of the two loans. (Pl. Ex. 76). Pidikiti admits that she and CIP have stopped making payments on the loans and that the loans are now in default.

Defendants Lester Boihem, Carroll Castille, Paul Peed, and Raymond Peed, who were sued in this action on guaranties similar to those asserted against Pidikiti and CIP, have settled SEPH's claims against them, paying SEPH a total of $3.65 million (Pl. Ex. 88-90), which SEPH

---

[8] At the summary judgment stage of this action, Pidikiti claimed that she was presented with and signed only the signature page for the 2006 limited guaranty. (See Pidikiti Affidavit, Doc. 84-1 at 2-3, ¶ 3; Pidikiti & CIP's Response to SEPH's Motion for Summary Judgment, Doc. 83 at 19 ("It is []clear that [Pidikiti] only received the signature page of the 2006 guaranty relating to the development loan, which Merryman represented, as the previous guaranty, contained only a strict 20% limitation of liability."); id. at 11-12, ¶¶ 28-29). Pidikiti admitted at trial that this claim was also reflected in her deposition testimony for this action. She testified, however, that after giving her deposition, she looked through her records and realized that she had in fact received the entire 2006 limited guaranty.

has applied to the loans' principal. As of October 23, 2013, the total outstanding amount owed on the two loans is $1,491,244.09. (Pl. Ex. 87).

SEPH has foreclosed on the Sandy Creek property, which was sold at auction on August 6, 2013, for $1.75 million, to Defendant Carroll Castille. Shortly after the foreclosure sale, but before the sale proceeds were applied to the loans, SEPH repurchased from all participating banks their interests in the property loan. (Pl. Ex. 98A-E).

### III. Analysis

#### a. Guaranties

Under Alabama law,[9] " '[e]very suit on a guaranty agreement requires proof of the existence of the guaranty contract, default on the underlying contract by the debtor, and nonpayment of the amount due from the guarantor under the terms of the guaranty.' " Sharer v. Bend Millwork Sys., Inc., 600 So. 2d 223, 225-26 (Ala. 1992) (quoting Delro Indus., Inc. v. Evans, 514 So. 2d 976, 979 (Ala. 1987)).[10] " 'Rules governing the interpretation and

---

[9] As the Court has previously determined on summary judgment, Alabama law governs the guaranties in this action. (Doc. 114 at 13-14).

[10] The guaranties at issue are continuing guaranties, which "contemplate[] a series of future transactions[,]" Shur-Gain Feed Division William Davies Co., Inc. v. Huntsville Production Credit Association, 372 So. 2d 1317, 1320 (Ala. Civ. App. 1979), and "can include subsequent indebtedness without new consideration being given[,]" Colonial Bank of Alabama v. Coker, 482 So. 2d 286, 292 (Ala. 1985).

"[T]o recover under a . . . continuing guaranty, an additional element, notice to the guarantor of the debtor's default, must be proved." Sharer, 600 So. 2d at 226 (quotation omitted). However, "[t]he language of the guaranty is controlling in determining whether the holder of the guaranty is under a duty to notify the guarantor of a default by the principal, and notice need not be given when the terms of the guaranty expressly dispense with the need for it." Id. Paragraph 6 of both the 2005 Unlimited Guaranties and the 2006 Limited Guaranty provides, in relevant part: "Guarantor waives all presentments, demands for performance, **notices of non-performance**, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and of the existence, creation, or incurring of new or additional Indebtedness" (emphasis added). The Alabama Supreme Court has held that similar language in a continuing guaranty waived the requirement to provide notice of default. See id. ("The guaranty agreement Sharer executed provides in pertinent part: []'We waive, in connection with the indebtedness and with our obligation under this Guaranty, all presentments, demands for performance, *notices of non-performance*, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty and of the existence, creation or incurring of any new or additional indebtedness.' [](Emphasis supplied.)

construction of contracts are applicable in resolving a question as to the interpretation or construction of a guaranty contract.' " Eagerton v. Vision Bank, 99 So. 3d 299, 304 (Ala. 2012) (quoting Gov't St. Lumber Co. v. AmSouth Bank, 553 So. 2d 68, 75 (Ala. 1989)). " 'The requisite elements of [a contract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.' " E.g., Ex parte Steadman, 812 So. 2d 290, 293 (Ala. 2001) (quoting Strength v. Ala. Dep't of Fin., Div. of Risk Mgmt., 622 So. 2d 1283, 1289 (Ala. 1993); Steiger v. Huntsville City Bd. of Ed., 653 So. 2d 975, 978 (Ala. 1995)).

### 1. Proof of Existence of Guaranty Contracts

The undisputed testimony at trial demonstrates that Vision offered to, and did in fact, make two loans to SC II – a $5 million property loan and a $2 million construction loan totaling $7 million – if, *inter alia*, CIP agreed to guaranty the property loan and Dr. Pidikiti agreed to guaranty both loans. CIP, through Dr. Pidikiti, authorized SC II to obtain both loans from Vision. Dr. Pidikiti also admits that her signature is on her and CIP's guaranties. Thus, offer, acceptance, and consideration establishing guaranty contracts have been shown.

Vision, through its attorneys, drafted the guaranties and provided them to Raley and Merryman to obtain guarantor approval. One's signature on a contract is a standard method of showing assent to its terms. See, e.g., I.C.E. Contractors, Inc. v. Martin & Cobey Const. Co., Inc., 58 So. 3d 723, 725 (Ala. 2010) ("The purpose of a signature on a contract is to show mutual assent . . ." (quotation omitted)). Dr. Pidikiti admitted to fully reading and signing the 2006 limited guaranty for the purpose of inducing Vision to make a $2 million loan to SC II. However, though Dr. Pidikiti admits that her signature is on the last page of each, she claims that she did not execute the 2005 unlimited guaranties SEPH seeks to enforce against her and CIP. Rather, she claims that, after refusing to sign unlimited guaranties for the property loan, she was

---

. . . Because Sharer waived his right to notice of Sash and Door's nonperformance on the underlying contract, we hold that Bend and Pozzi were not required to prove that they gave Sharer such notice."). As such, because Pidikiti and CIP waived the requirement, SEPH need not show it provided notice to them of SC II's default on the notes in order to enforce the guaranties.

9

presented with and executed guaranties that limited her and CIP's liability on the property loan to $1 million (i.e. 20% of the principal amount). Dr. Pidikiti has been unable to locate a copy of these claimed limited guaranties.

Dr. Pidikiti pointed out to the Court that the signature page of each 2005 unlimited guaranty differs stylistically from the preceding pages. The Court has examined the original copies of these guaranties and determined that the word font of the signature pages appears a different size and slightly bolder compared to that of the preceding pages and that the paper of the signature pages appear to be a different color than the paper of the preceding pages. Examination of the original copy of Dr. Pidikiti's 2006 limited guaranty did not show any similar discrepancies. Though Dr. Pidikiti would like the Court to infer from these observations that someone has attached her signature pages to different guaranties, the Court finds a different scenario, described *infra*, more plausible.

On summary judgment, Dr. Pidikiti represented that she received full copies of the 2005 unlimited guaranties but only signature pages for the 2006 limited guaranty. At trial, she represented that after further reflection she realized that she had in fact received full copies of the 2006 limited guaranty as well and that she simply failed to remember this fact when she testified otherwise at deposition. Having observed Dr. Pidikiti's demeanor at trial, the Court does not believe that her testimony at trial was deliberately untruthful as to this important detail. However, Dr. Pidikiti's demonstrably faulty memory regarding the guaranties, coupled with the fact that she believed that the property loan guaranties she signed contained limitations on liability similar to that imposed in the 2006 limited guaranty, leads the Court to believe that she is failing to remember correctly which guaranties for which she received full copies.

The Court finds it most likely that Dr. Pidikiti in fact received the full 2006 limited guaranty but only the signature pages for the 2005 unlimited guaranties. This would account for her inability to locate copies of the claimed limited guaranties for the property loan. This scenario also reasonably explains the differences between the signature pages of the 2005

unlimited guaranties and the remainder of the documents – the signature pages sent to Dr. Pidikiti for execution were printed separately from the remainder of the documents to which they were later attached. This determination is bolstered by the unrebutted testimony of other witnesses at trial. J. Stephen Harvey, the attorney for Vision who drafted all of the loan documents at issue in this action, testified that he did not draft any limited guaranty for execution on the property loan. Alexander Braswell ("Braswell"), SEPH's company representative, testified that full, unlimited liability by all guarantors was a requisite for making the property loan to SC II and that the loan would not have been made if any guarantor did not agree to unlimited liability.[11]

Having determined that the evidence supports a finding that Dr. Pidikiti received the signature pages for the 2005 unlimited guaranties that SEPH wishes to enforce, the Court notes, as it did on summary judgment, "Alabama law provides that []'in the absence of fraud or misrepresentation, a party is bound by the terms of a contract, even if he fails to read it. The law is equally clear that ordinarily when a competent adult, having the ability to read and understand an instrument, signs a contract, he will be held to be on notice of all the provisions contained in that contract and will be bound thereby.' " Brown v. Brown, 26 So. 3d 1210, 1214 (Ala. Civ. App. 2007) (quoting Power Equip. Co. v. First Ala. Bank, 585 So. 2d 1291, 1296 (Ala. 1991) (internal citations omitted)). Dr. Pidikiti's failure to read the entirety of the 2005 unlimited guaranties, therefore, does not excuse her and CIP from being bound by their terms. Moreover, there is no evidence that anyone from Vision misrepresented any terms of the guaranties to Dr. Pidikiti.

Accordingly, the Court finds that the preponderance of the evidence at trial supports Dr. Pidikiti's assent to both the 2005 unlimited guaranty and the 2006 limited guaranty and CIP's

---

[11] In any event, Dr. Pidikiti admitted at trial that she would be liable for $1 million on the property loan. As set forth *infra*, the total outstanding amount owed on the property loan is less than $1 million. Therefore, even under her factual scenario of having signed a guaranty limiting her liability to 20% of the property loan (i.e. $1 million), she would be liable for the full amount sought at trial by SEPH against her on the property loan.

assent to the 2005 unlimited guaranty. Therefore, SEPH has established the existence of these guaranty contracts.

### 2. Default on Underlying Contract

The undisputed evidence at trial indicates that SC II is in default on both loans. Moreover, in their joint pretrial document (Doc. 129), which the Court adopted in its final pretrial order (Doc. 132) pursuant to Federal Rule of Civil Procedure 16, "[t]he parties agree that if the 2009 loan modification was valid, that Sandy Creek was in default as of June 25, 2011." (Doc. 129 at 2). At trial, SEPH presented copies of the 2009 Amended Promissory notes, duly executed by SC II. Paragraph 5 of the 2005 unlimited guaranties and the 2006 limited guaranty provides: "Guarantor authorizes Bank, without notice or demand and without affecting his liability hereunder, from time to time to (a) renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof . . . [and] (c) amend, modify, restate, extend, consolidate or replace **the Loan Agreement,**[12] the Note or any other Loan Document . . ." Dr. Pidikiti and CIP presented no evidence or argument at trial demonstrating that the 2009 Amended Promissory Notes, the operative promissory notes SEPH seeks to enforce in this action, were invalid.

Accordingly, the Court finds that SC II is in default on the underlying contracts.

### 3. Non-payment by Guarantors

Dr. Pidikiti and CIP admitted at trial that they have ceased making payments on the loans pursuant to the guaranties, and they did not contest that they owe some outstanding amount to SEPH pursuant to the guaranties. Accordingly, the Court finds the element of "nonpayment of the amount due from the guarantors under the terms of the guaranties" to have been conclusively established. As such, SEPH has proven its claim for breach of guaranty contracts against the Dr. Pidikiti and CIP.

---

[12] The boldfaced portion is included in the 2005 unlimited guaranties but not the 2006 limited guaranty. The Court does not find the inclusion or absence of this portion to be material as to the relevant application of this provision.

4. **Amounts Owed**

Braswell testified that, after the proceeds of the foreclosure sale and of SEPHS's settlements with certain other guarantors were applied to the loans, the total outstanding amount owed on both loans as of October 23, 2013, is $1,491,244.09, consisting of:

**Balance as of Sept. 13, 2013**

|  | Property Loan | Construction Loan | Total |
|---|---|---|---|
| Principal | $266,872.12 | $600,000.00 | $866,872.12 |
| Interest | $272,293.90 | $334,174.72 | $606,468.62 |
| Balance | $539,166.02 | $934,174.72 | $1,473,340.74 |

**Per Diem Interest from Sept. 13, 2013, to Oct. 23, 2013 (40 days)**

|  | Rate | Days |  | Total |
|---|---|---|---|---|
| Property Loan | $59.30492 x | 40 | = | $2,372.20 |
| Construction Loan | $133.33333 x | 40 | = | $5,333.33 |
| Per Diem Interest |  |  |  | $7,705.53 |

**Total**

$1,473,340.74 total balance

$7,705.53 total per diem interest

+ $10,197.82 taxes[13]

**$1,491,244.09**

Dr. Pidikiti admitted at trial that she would be liable for $1 million on the property loan, and under the 2006 limited guaranty Dr. Pidikiti is liable for up to $600,000 in principal on the construction loan, as well as 100% of any interest accruing on the loan. SEPH has adequately

---

[13] Braswell testified that SEPH has had to pay this amount in taxes on the Sandy Creek property. Under the terms of the mortgage, SC II had agreed to "pay promptly, when and as due, . . . all taxes, . . . charges, fines, penalties, costs and other expenses incurred, and impositions of every nature whatsoever imposed, levied or assessed or to be imposed, levied or assessed upon or against the Mortgaged Property or any part thereof . . ." (Pl. Ex. 20, § 1.05(a); Pl. Ex. 36).

proven that these are the amounts owed on both loans as of October 23, 2013, and, as set forth *infra*, the Court rejects Dr. Pidikiti and CIP's arguments that SEPH was required to apply the foreclosure proceeds in a different manner that may have altered these amounts.

**b.     Defenses**

Dr. Pidikiti and CIP contest the manner in which SEPH applied the $1.75 million received from the foreclosure sale of the Sandy Creek property to the outstanding amounts on the loans, arguing that SEPH was required to use those proceeds to pay off the entire outstanding balance owed on the property loan, rather than using it to pay off parts of both loans.[14]

First, they cite to Ala. Code § 8-8-11, which states that, with some inapplicable exceptions, "when partial payments are made, the interest due is first to be paid and the balance applied to the payment of the principal . . ." However, § 8-8-11 applies "absent a contract to the contrary . . ." Life Ins. Co. of Georgia v. Johnson, 725 So. 2d 934, 942 (Ala. 1998) (citing Selman v. Bryant, 72 So. 2d 704, 708 (Ala. 1954); De Moville v. Merchants & Farmers Bank of Greene County, 186 So. 704 (Ala. 1939); § 8-8-11). See also Bank of Prattville v. Colonial Bank, 718 So. 2d 17, 19 (Ala. 1998) (" 'If a debtor owes two different debts to the same creditor, one debt being secured and the other being unsecured, the debtor has the right, at the time of payment, to direct the application of the partial payments. However, if the debtor does not direct the application of his partial payments to one or the other of the debts, then the creditor, at the time of payment, may elect to apply the payments to either of the debts. *If neither debtor nor creditor expresses an election, it is presumed that the credit is to be applied most beneficially to the creditor, that is, to the most precarious debt or to the one least secured.* Lee v. Southern Pipe and Supply Company, 283 Ala. 37, 214 So. 2d 313 (1968).' " (quoting Lipscomb v. Tucker, 314 So. 2d 840, 845 (Ala. 1975)).

---

[14] The manner in which SEPH did so left exactly $600,000.00 of principal owing on the construction loan, the exact amount for which Dr. Pidikiti is liable under the terms of the 2006 limited guaranty.

As SEPH points out, Paragraph 5 of the 2005 unlimited guaranties and the 2006 limited guaranty provide: "Guarantor authorizes Bank, without notice or demand and without affecting his liability thereunder, from time to time to . . . (b) take and hold security for the payment of this Guaranty or the Indebtedness guaranteed, and exchange, modify, enforce, waive and release any such security . . . [and] (d) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine . . ." Moreover, Paragraph 6 of the 2005 unlimited guaranties and the 2006 limited guaranties states, in relevant part: "Until the Indebtedness of Borrower to Bank shall have been paid in full, even though such Indebtedness is in excess of Guarantor's liability hereunder, . . . Guarantor . . . waives any benefit of, and any right to participate in any security now or hereafter held by Bank." The Court disagrees with the Defendants' assertion that the phrase "Guarantor authorizes Bank . . . to . . . apply []security . . . as Bank in its discretion may determine" is silent or ambiguous as to SEPH's discretion in applying the foreclosure proceeds because it does not specifically refer to "proceeds of collateral," "application of payments or monies," or some similar language. The general purpose of holding security for a loan, particularly real property, is to sell it in the case of default so that the sale proceeds can be used to cover some or all of the outstanding balance. Thus, the term "to apply security" is not ambiguous as it applies to the Sandy Creek property held as security for the loans.

At trial, Dr. Pidikiti and CIP argued that the terms of SEPH's participation agreements with the banks participating in portions of the property loan mandated a different allocation of the foreclose proceeds than that applied by SEPH, citing a number of cases applying the law of other jurisdictions in support. However, SEPH presented evidence at trial that it repurchased the interest of the participating banks in the property loan shortly after the foreclosure sale but before allocation of the proceeds. Also, Dr. Pidikiti and CIP appear to have abandoned this argument in their post-trial briefing (see Doc. 140).

Dr. Pidikiti and CIP assert, in their post-trial brief, that SEPH was bound to apply the

15

foreclosure proceeds pursuant to the terms of the mortgage securing the promissory notes for both loans. However, neither Dr. Pidikiti nor CIP are parties to the mortgage – the only signatory is SC II. The Defendants argue that Dr. Pidikiti "became a party to the Mortgage and is entitled to assert the provisions therein by the Supplement to Loan Documents she signed on July 30, 2009. (SEPH Ex. 76)." (Doc. 140 at 3). Dr. Pidikiti and CIP do not cite to any particular provision of the Supplement to Loan Documents to support this assertion, and the Court's own reading of the document finds none. Moreover, Paragraph 6 of the 2005 unlimited guaranties and the 2006 limited guaranties states, in relevant part: "Until the Indebtedness of Borrower to Bank shall have been paid in full, even though such Indebtedness is in excess of Guarantor's liability hereunder, . . . Guarantor waives any defense arising by reason of any disability or other defense of borrower . . . Guarantor . . . waives any benefit of, and any right to participate in any security now or hereafter held by Bank." The express terms of the guaranties, then, prevent Dr. Pidikiti and CIP from asserting any defense arising from the mortgage. As such, the Court rejects their argument that any allocation scheme set out in the mortgage controls the application of the foreclosure proceeds as to them.

**IV.    Attorneys' Fees & Costs**

SEPH asserts that it is contractually entitled to recover attorneys' fees and costs from the remaining defendants in this action. Accordingly, SEPH is **ORDERED** to file, on or before **Wednesday, November 13, 2013**, whatever materials it deems necessary and appropriate to support its entitlement to and claim for costs and fees.[15] Any response in opposition to SEPH's petition for fees and costs shall be filed on or before **Wednesday, November 20, 2013**, at which time the Court will take the matter under submission.[16]

---

[15] The Court suggests that SEPH, in preparing its petition for attorneys' fees and costs, keep in mind the guidance on properly preparing such a petition set out in Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292 (11th Cir. 1988).

[16] The Court will enter a final Judgment specifying the amount of damages after a determination is made concerning the issue of attorneys' fees and costs.

16

V. **Conclusion**

In accordance with the foregoing analysis, the Court hereby finds in favor of SEPH and against Pidikiti and CIP on SEPH's claims for breach of guaranty contracts (as set forth in Count 2 of the Complaint), in the following amounts:

- **$551,736.04** against Dr. Pidikiti and CIP for amounts owing on the property loan, jointly and severally as to each other and with the remaining Defendants (SC II and George W. Skipper, III), consisting of $266,872.12 in loan principal, $272,293.90 in accrued interest as of September 13, 2013, $2,372.20 in per diem interest from September 13, 2013, to October 23, 2013, and $10,197.82 in taxes paid by SEPH; and

- **$939,508.05** against Dr. Pidikiti for amounts owing on the construction loan, jointly and severally with Defendants SC II and George W. Skipper, III, consisting of $600,000.00 in loan principal, $334,174.72 in accrued interest as of September 13, 2013, and $5,333.33 in per diem interest from September 13, 2013, to October 23, 2013.

Interest will continue to accrue at a per diem rate of $59.30492 for the property loan and $133.33333 for the construction loan until the entry of final judgment; thus, the amounts at final judgment will be adjusted accordingly. Attorneys' fees and costs will be addressed as set out in Section IV, *supra*.

**DONE** and **ORDERED** this the **5th** day of **November 2013**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**